[No. G030382. Fourth Dist., Div. Three. June 12, 2003.]

FOUNDING MEMBERS OF THE NEWPORT BEACH COUNTRY CLUB, Plaintiff and Appellant, v.
NEWPORT BEACH COUNTRY CLUB, INCORPORATED, Defendant and Respondent.

**COUNSEL**

Grant, Genovese & Baratta, David C. Grant and Gordon G. May for Plaintiff and Appellant.

Pinto & Dubia, Laura P. Couch; Dubia, Erickson, Tenerelli & Russo, Christian F. Dubia, Jr., and Mark D. Erickson for Defendant and Respondent.

## OPINION

### FYBEL, J.—

#### INTRODUCTION

In this case, we examine and apply principles of contract interpretation to construe a "Right of First Offer" contained in the governing regulations of a country club. Our interpretation leads us to affirm summary judgment in favor of defendant The Newport Beach Country Club, Incorporated (NBCC).

Plaintiff Founding Members of The Newport Beach Country Club (Founding Members) is an unincorporated association. Its membership consists entirely of Class A Founding Members of The Newport Beach Country Club (the Club), which is owned by NBCC. Founding Members sued NBCC for breach of contract, specific performance, declaratory relief, and mandatory injunction for claims arising out of a Right of First Offer contained in the Club's governing regulations. The Right of First Offer provides, in relevant part: "In the event the Owner shall, at any time, desire to offer part or all of its legal interest in the Club for sale . . . , Owner shall first extend the opportunity to purchase such interest in the Club to any organization then in existence composed solely of members or an organization of which at least fifty-one percent (51%) of the members or shareholders are then members of the Club, each of whom shall have advised Owner in writing of his election to become a shareholder or member of such 'Member Organization.' "

In October 1999, IBC, Inc. (IBC), which owns all of the stock of NBCC, entered into an agreement to sell its stock to a third party. Founding Members contends this agreement triggered NBCC's obligations under the Right of First Offer. Founding Members did not, however, exist as of October 1999.

The trial court, in granting NBCC's motion for summary judgment, concluded the Right of First Offer extended only to an "organization" and neither Founding Members nor any member organization, as contemplated by the governing regulations, existed as of October 1999. The trial court also concluded the agreement to sell IBC's stock did not trigger NBCC's obligations under the Right of First Offer.

We conclude the trial court correctly construed the contract as extending the Right of First Offer only to a "Member Organization . . . in existence." Because the undisputed facts revealed that neither Founding Members nor any member organization, as referred to in the governing regulations, existed as of the date of the agreement to sell IBC's stock, NBCC had no obligations under the Right of First Offer. In light of this conclusion, we do not address whether the agreement to sell IBC's stock constituted an agreement to sell "part or all" of NBCC's "legal interest in the Club." Founding Members does not challenge summary adjudication on its claim for injunctive relief.

FACTS

On September 25, 1985, IBC Investment Co., Inc., acquired the assets of Irvine Coast Country Club, Inc. The assets included a private golf course and clubhouse on leased land in Newport Beach, known as the Irvine Coast Country Club (ICCC). Some ICCC members also had expressed interest in purchasing the club, but they were unsuccessful.

IBC Investment Co., Inc., changed ICCC's name to The Newport Beach Country Club and changed its own name to The Newport Beach Country Club, Incorporated. NBCC became the tenant of the ground lease on the land on which the Club is located.

IBC owns all of the stock of NBCC. Beverly Ray, as trustee of The Beverly K. Ray Trust, owns all of the stock of IBC.

Many club members were unhappy about the Club's sale to NBCC. Rumors were afloat that NBCC bought the Club for investment purposes and intended eventually to sell it to a foreign investor. In response to those concerns, NBCC extended an offer to become a Class A Founding Member of the Club. To become a Class A Founding Member, a member was required to make a deposit of $3,500 (later increased to $4,500), which NBCC would hold interest-free for 15 years.

The original NBCC governing regulations, dated September 1, 1985 and effective September 25, 1985 (the 1985 Governing Regulations), contained a Right of First Offer in the event any legal interest in the Club was offered for sale. Article V, section 2 of the 1985 Governing Regulations provided, in relevant part:

"SECTION 2. *Right of First Offer.*

"(a) In the event the Owner shall, at any time, decide to offer the legal interest in the Club for sale . . . , it shall first extend the opportunity to

purchase the Club to any organization then in existence, composed solely of Members, the members or shareholders of which organization include at least 51% of the Members, each of whom shall have advised Owner in writing of his election to become a shareholder or member of such organization. . . .

"(b) In the event that such an organization does not exist, or if, in existence, such organization did not agree to purchase the Club on the proposed terms, then the Owner would be free to offer the Club for sale to any other party at an equivalent price and terms or at a greater price than offered to the Members' organization. . . .

"The term 'Members' as used in Article V refers to Class A Founding members."

Prospective club members were required to complete an application for membership in which the prospective member agreed that he or she will be "bound by and will comply with the Governing Regulations of the Club . . . as . . . may now exist or may from time to time be amended." The application stated that membership "does not confer . . . any ownership interest in, or liability for, property and assets owned by [NBCC]."

In a letter dated October 22, 1985, William Ray and Thomas Deemer (then, respectively, chairman of the board and president of NBCC) "apologize[d]" to the Club members that "in our rush to get the new Governing Regulations published, the resulting small print makes reading tedious." The letter continued, "[w]e have been frequently asked the question, 'Why should I become a Class A Founding member?' Our answer is that it is entirely your choice, but we feel that it is a good offer." In explaining the benefits of a Class A Founding Membership, the letter stated, "*A Right of First Refusal. In the event a decision is ever made to sell the Club to an unrelated third party, it must be first offered to the Founding Members as a group. This precludes any future surprise changes in ownership.*"

The 1985 Governing Regulations was amended on September 1, 1987 (the 1987 Governing Regulations). The Right of First Offer was amended to read (in relevant part) as follows:

"SECTION 2. *Right of First Offer.*

"A. In the event the Owner shall, at any time, desire to offer part or all of its legal interest in the Club for sale . . . , Owner shall first extend the opportunity to purchase such interest in the Club to any organization then in

existence composed solely of members or an organization of which at least fifty-one percent (51%) of the members or shareholders are then members of the Club, each of whom shall have advised Owner in writing of his election to become a shareholder or member of such 'Member Organization.' In that event, the proposal will be submitted to such Member Organization in writing, setting forth the terms and conditions on which the Owner would be prepared to sell such interest in the Club. The Member Organization will be given sixty (60) days after receipt of the written offer to enter into an unconditional, binding contract with the Owner to purchase such interest in the Club on the terms and conditions proposed, with the sale to close not later than ninety (90) days thereafter. . . .

"B. In the event that the Member Organization does not exist or, if in existence, such Organization did not agree to purchase the subject interest in the Club on the proposed terms, then the Owner will be free to offer such interest for sale to any other party at an equivalent price and terms or at a greater price and terms as Owner may determine in its sole discretion than offered to the Members Organization. . . .

"The term 'members' as used in Article V refers only to Class A Founding members."

The 1987 Governing Regulations was subsequently amended on May 1, 1990, May 15, 1994, November 1, 1997, and September 15, 1999. None of these amendments altered the Right of First Offer.

On October 26, 1999, Beverly Ray entered into an agreement with PacPro, LLC (PacPro), to sell at least 81 percent of IBC's stock to PacPro for $73.5 million. In addition to the stock of NBCC, IBC owned the Balboa Bay Club, the Balboa Bay Racket Club, the Terrace Apartments, and other real property on Pacific Coast Highway. The agreement between Ray and PacPro did not allocate any portion of the purchase price to NBCC. Nonetheless, IBC's chief financial officer informally allocated $27.56 million to $30 million of the sale price to NBCC. Escrow on the PacPro sale was scheduled to close on March 31, 2000.

As of October 26, 1999, no member organization existed that was composed of Class A Founding Members. As of that date, NBCC had not received notice from any Class A Founding Member of his or her election to become a member or shareholder of a member organization.

In late January 2000, NBCC received a letter dated January 21, 2000, from an attorney representing "the NBCC Golf Club Equity Committee."

The letter stated: "The Committee is currently in existence and at least fifty-one percent of its members are Class A Founding Members of the Newport Beach Country Club. This letter is being provided to you as notice pursuant to Article V, Section 2 of the Newport Beach County [*sic*] Club Governing Regulations. Any proposal pursuant to such Article V, Section 2 should be submitted to the undersigned as attorney for the Committee." The letter was the first notice NBCC had been given of the existence of the NBCC Golf Club Equity Committee.

The escrow for the sale of IBC stock to PacPro did not close. The transaction was cancelled, and PacPro served a demand for the return of its deposit.

Articles of association for Founding Members were prepared and signed in August or September of 2001. On August 3, 2001, Founding Members filed with the Secretary of State a "STATEMENT BY UNINCORPO-RATED ASSOCIATION OF ADDRESS OF PRINCIPAL OFFICE AND DESIGNATION OF AGENT FOR THE SERVICE OF PROCESS." On the same date, a fictitious business name statement was filed for Founding Members. On August 31, 2001, a fictitious business name statement was filed for NBCC Golf Equity Committee. Neither IBC nor NBCC extended Founding Members an offer to purchase the Club.

PROCEEDINGS IN THE TRIAL COURT

On August 14, 2001, Founding Members filed a complaint for declaratory relief, specific performance, breach of contract, and mandatory injunction. The complaint alleged that since September 1985, Founding Members "was and is an organization in existence comprised solely of Class A Founding Members . . . ." and that PacPro's offer to purchase the stock of IBC triggered NBCC's obligation pursuant to article V, section 2 of the Club's governing regulations to extend to Founding Members the opportunity to purchase the Club. The complaint alleged a right to an injunction prohibiting NBCC from terminating membership interests in retaliation for pursuing the lawsuit.

NBCC moved for summary judgment or, in the alternative, for "summary adjudication of issues" on the grounds: (1) the proposed sale of IBC's stock to PacPro did not trigger the Right of First Offer; (2) as of October 26, 1999, no member organization existed to which the Right of First Offer could be

extended; (3) Founding Members could not show irreparable injury supporting injunctive relief; and (4) Founding Members lacked standing to bring a representative action.

After a daylong hearing, the trial court granted NBCC's motion. The order granting summary judgment dealt first with NBCC's second ground for summary judgment, stating: "Plaintiff and its putative members have failed to comply with the clear and unambiguous requirements of Article V, Section 2, of the Governing Regulations of [the Club] which sets forth the requirements for registering an organization entitled to receive notice of a qualifying offer to purchase. Plaintiff was not in existence at the time of the October 26, 1999 Letter Agreement that is the subject of the Complaint (the 'Letter Agreement') and Plaintiff had not satisfied the notice requirements of the Governing Regulations as of the date of the hearing on January 25, 2002 (let alone October 26, 1999) which required notice of the existence of an organization composed solely of Class A Founding Members or an organization of which at least 51% of the members or shareholders were then Class A Founding Members of the Club, each of whom shall have advised NBCC in writing of his election to become a shareholder or member of such member organization. The failure of Plaintiff and its members to comply with the notice requirements of the Governing Regulations means there is no organization to whom NBCC is obligated to provide notice of a qualifying offer."

The trial court then concluded, with respect to NBCC's first ground for summary judgment, that "[e]ven assuming that Plaintiff had properly registered as an organization entitled to notice of a qualifying offer, which this Court specifically finds it did not, the proposed sale of stock by Beverly Ray in [IBC] pursuant to the Letter Agreement was not a triggering event giving rise to a right of first offer." The trial court found, with respect to Founding Member's claim for injunctive relief, "neither Plaintiff nor its members suffered any irreparable harm nor are they presently facing any action that could be characterized as a retaliatory action so as to create a justiciable controversy."

Judgment in favor of NBCC was entered on February 19, 2002. Founding Members timely appealed.

We review summary judgment de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 35 [123 Cal.Rptr.2d 555].)

DISCUSSION

I.

*Summary Judgment of Founding Members' Contract Claims Was
Appropriate Because at the Time of the PacPro Agreement, No Member
Organization Existed to Exercise the Right of First Offer*

A. *What Constitutes the Contract?*

 The threshold issue is, what constitutes the contract? In the membership application, the prospective club member agreed that he or she will be "bound by and will comply with the Governing Regulations of the Club . . . as . . . may now exist or may from time to time be amended." Founding Members and NBCC agree the contract includes the 1987 Governing Regulations. At oral argument, counsel for Founding Members and counsel for NBCC agreed the 1987 Governing Regulations superseded the 1985 Governing Regulations. Founding Members argues the contract also includes the October 22, 1985 letter from William Ray and Thomas Deemer to the Club members.

Whether the October 22, 1985 letter may be considered to be part of the contract depends upon the extent to which the 1987 Governing Regulations is an integrated writing. We conclude the 1987 Governing Regulations is integrated at least on the issue of the Right of First Offer and therefore the October 22, 1985 letter is not part of the contract.

 California's parol evidence rule is codified in section 1856 of the Code of Civil Procedure. Subdivision (a) of section 1856 provides: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." As explained by Justice Traynor, "[w]hen the parties to a written contract have agreed to it as an 'integration'—a complete and final embodiment of the terms of an agreement—parol evidence cannot be used to add to or vary its terms." (*Masterson v. Sine* (1968) 68 Cal.2d. 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561].) An integration may be partial rather than complete: The parties may intend that a writing finally and completely express only certain terms of their agreement rather than the agreement in its entirety. (*Ibid.*) If the agreement is partially integrated, the parol evidence rule applies to the integrated part. (*Ibid.*; *Haggard v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App.4th 508, 517 [46 Cal.Rptr.2d 16].)

In considering whether a writing is integrated, the court must consider the writing itself, including whether the written agreement appears to be

complete on its face; whether the agreement contains an integration clause; whether the alleged parol understanding on the subject matter at issue might naturally be made as a separate agreement; and the circumstances at the time of the writing. (*Masterson v. Sine, supra,* 68 Cal.2d at pp. 225-226; *Esbensen v. Userware Internat., Inc.* (1992) 11 Cal.App.4th 631, 637 & fn. 3 [14 Cal.Rptr.2d 93].) Whether a contract is integrated is a question of law when the evidence of integration is not in dispute. (*EPA Real Estate Partnership v. Kang* (1992) 12 Cal.App.4th 171, 176 [15 Cal.Rptr.2d 209]; *Esbensen v. Userware Internat., Inc., supra,* 11 Cal.App.4th at p. 638, fn. 4.)

█ The 1987 Governing Regulations is complete on the issue of the Right of First Offer. Article V, section 2 of the 1987 Governing Regulations sets forth the Right of First Offer at length. The 1987 Governing Regulations has an integration clause stating: "These Regulations, along with Rules, shall constitute the entire agreement and understanding between Management and Club members. No oral representations shall have any effect nor shall they modify any of the terms and conditions contained in the aforementioned documents." Thomas Deemer, a signer of the October 22, 1985 letter and the president of NBCC from 1985 to 1993, testified he wanted the integration clause in the governing regulations "[b]ecause when you have a number of different people involved in the dissemination of information to people, sometimes things are said differently than they should have been and are misinterpreted."

The parties' understanding of the Right of First Offer would not " '*naturally* be made as a separate agreement.' " (*Masterson v. Sine, supra,* 68 Cal.2d at p. 227.) Here, the parties made the Right of First Offer part of the 1985 Governing Regulations and the 1987 Governing Regulations.

We need not reach the issue whether the 1987 Governing Regulations is a complete integration, but conclude the 1987 Governing Regulations is integrated at least as to the Right of First Offer. █ Accordingly, as to the Right of First Offer, "extrinsic evidence is admissible *only* to supplement or explain the terms of the agreement—and even then, only where such evidence is *consistent* with the terms of the integrated document, and only where the writing is not also intended as an *exclusive* statement regarding its subject matter. [Citation.]" (*EPA Real Estate Partnership v. Kang, supra,* 12 Cal.App.4th at pp. 176-177; see also Code Civ. Proc., § 1856, subds. (a), (b) & (d).) █ The October 22, 1985 letter did not state it was, nor did it purport to be, part of the governing regulations and therefore was not a part of the contract between NBCC and the Club members. The relevance and admissibility of the October 22, 1985 letter is determined by rules governing extrinsic evidence, as discussed below.

B. *Controlling Principles of Contract Interpretation.*

The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. (Civ. Code, § 1639.) "The words of a contract are to be understood in their ordinary and popular sense." (Civ. Code, § 1644; see also *Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197-1198 [32 Cal.Rptr.2d 144] ["We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made"].)

 Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111 [63 Cal.Rptr.2d 261]; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. (*Powers v. Dickson, Carlson & Campillo, supra,* 54 Cal.App.4th 1102, 1111; *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554 [32 Cal.Rptr.2d 676]; *Winet v. Price, supra,* 4 Cal.App.4th 1159, 1165.) Thus, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review. (*Appleton v. Waessil, supra,* 27 Cal.App.4th 551, 554-555; *Winet v. Price, supra,* 4 Cal.App.4th 1159, 1165-1166.)

The ultimate construction placed on the contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Winet v. Price, supra,* 4

Cal.App.4th at p. 1166.) When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378]; *Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.)

■ California recognizes the objective theory of contracts (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 948 [65 Cal.Rptr.2d 777]), under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation" (*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127 [211 Cal.Rptr. 62]). The parties' undisclosed intent or understanding is irrelevant to contract interpretation. (*Winograd v. American Broadcasting Co., supra,* 68 Cal.App.4th at p. 632; *Berman v. Bromberg, supra,* 56 Cal.App.4th at p. 948.)

C. *Application of Contract Interpretation Principles.*

1. *The Contract Language*

■ We turn first to the language of the contract itself. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

In the 1985 Governing Regulations, the Right of First Offer stated, in relevant part: "In the event the Owner shall, at any time, decide to offer the legal interest in the Club for sale . . . , it shall first extend the opportunity to purchase the Club to *any organization then in existence,* composed solely of Members, the members or shareholders of which organization include at least 51% of the Members, each of whom shall have advised Owner in writing of his election to become a shareholder or member of such organization." (Italics added.) The 1985 Governing Regulations stated the opportunity to purchase the Club must be extended to "*any organization then in existence.*" Subsection (b) of section 2, article V stated, "[i]n the event that such an *organization* does not exist, or if, in existence, such *organization* did not agree to purchase the Club on the proposed terms, then the Owner would be free to offer the Club for sale to any other party at an equivalent price and terms or at a greater price than offered to the *Members' organization.*" (Italics added.) The 1985 Governing Regulations thus contemplated the Right of First Offer be exercised by an organization separate and apart from the Class A Founding Members themselves.

The 1987 Governing Regulations retains the requirement that an organization exercise the Right of First Offer. Article V, section 2 of the 1987

Governing Regulations states: "In the event the Owner shall, at any time, desire to offer part or all of its legal interest in the Club for sale . . . , Owner shall first extend the opportunity to purchase such interest in the Club to any *organization then in existence* composed solely of members or an organization of which at least fifty-one percent (51%) of the members or shareholders are then members of the Club." (Italics added.) Subsection B of section 2, article V of the 1987 Governing Regulations states: "In the event that the *Member Organization* does not exist or, if in existence, such *Organization* did not agree to purchase the subject interest in the Club on the proposed terms, then the Owner will be free to offer such interest for sale to any other party at an equivalent price and terms or at a greater price and terms as Owner may determine in its sole discretion than offered to the *Members Organization*." (Italics added.)

The 1987 Governing Regulations refers repeatedly to a "Member Organization . . . in existence" or an "organization then in existence" as having the right to exercise the Right of First Offer. The ordinary and usual meaning of the word "organization" as a noun is "a group of people that has a more or less constant membership, a body of officers, a purpose, and [usually] a set of regulations." (Webster's 3d New Internat. Dict. (1993) p. 1590.) The 1987 Governing Regulations, as the 1985 Governing Regulations, contemplates a member organization separate from the existence of the members themselves. Thus, the 1987 Governing Regulations, as the 1985 Governing Regulations, states the "Owner shall first extend the opportunity to purchase such interest in the Club to any *organization then in existence*" (italics added) and specifically addresses the situation where a member organization does not exist when the Owner decides to sell all or part of its legal interest in the Club. By using the phrase "then in existence," the 1987 Governing Regulations requires some kind of member organization separate from the existence of the members themselves. Otherwise, the phrase "then in existence" would be superfluous. ■ An interpretation rendering contract language nugatory or inoperative is disfavored. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473 [80 Cal.Rptr.2d 329].)

### 2. *The Extrinsic Evidence*

■ Focusing on the October 22, 1985 letter, Founding Members asserts the governing regulations do not require the existence of a member organization to exercise the Right of First Offer. Rather, Founding Members argues the Right of First Offer may be exercised by Class A Founding Members "as a group."

As explained above, the October 22, 1985 letter was not part of the contract, and the 1987 Governing Regulations permits only a "Member Organization . . . in existence" to exercise the Right of First Offer. But in keeping with the principle that "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face" (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 37), we examine the extrinsic evidence to determine whether it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Ibid.*)

In opposition to the motion for summary judgment, Founding Members submitted the declarations of Jackaleen Bouchey, Thomas Deemer, Larry Bemis, and Ronald G. Foster on the issue of interpreting the Right of First Offer.

In 1985, Bouchey was the NBCC administrative assistant and club manager. One of her job responsibilities was to promote the sale of Class A Founding Memberships. She declared that Deemer and William Ray told her "the primary benefit to those who chose to become Class A Founding Members was that . . . the Founding Members 'as a group' would be entitled to the right of first offer if the owner of the Club ever decided to sell out to an unrelated third party. Messrs. Deemer and Ray emphasized to me that this right was important and critical because the former ICCC members were disappointed and unhappy that they were unable to acquire ICCC from its former owners, the Smith Family, and needed assurances that no 'surprise change of ownership or control' to an unrelated third party would take place without the opportunity first being given to them to acquire the Club." Bouchey further declared that Deemer and Ray instructed her "to explain to all prospective Class A Founding Members that they were protected from any sale or transfer of control or ownership of NBCC by the Right of First Offer, i.e., the Class A Founding Members would be given the right of first offer before ownership or control of NBCC would be given to any unrelated third party." As a result, Bouchey declared she "had many meetings with former members of ICCC at NBCC in the fall and winter of 1985 and the ensuing years at which time I explained the benefits to them of Class A Founding Memberships and particularly explained, oftentimes in response to questions asked by the prospective Class A Founding Members, that the Right of First Offer was geared to protect the Founding Members, as a group, against any surprise change of ownership or control."

William Ray, the sole shareholder of IBC, and Deemer negotiated on behalf of IBC for the purchase of the Club. Deemer declared he had heard

many ICCC members were unhappy about the sale of the Club and were concerned the Club would eventually be sold to a foreign investor. In response, Deemer and Ray discussed whether "IBC should provide new members in NBCC with some type of preemptive right to ensure that no unrelated third party would acquire control of the Club." "Accordingly," Deemer declared, "we devised a 'Right of First Offer' for those who chose to become Class A Founding Members in NBCC, and included same in Article V, Section 2 of the first draft of the Governing Regulations of Irvine Coast Country Club, dated September 1, 1985."

Deemer declared that the governing regulations were difficult to read, so he and Ray "felt it would be appropriate to write all of the members of ICCC and explain to them the benefits of becoming a Class A Founding Member, and particularly the scope and intent of the Right of First Offer/Refusal." As a result, Deemer and Ray prepared the October 22, 1985 letter and sent it to prospective NBCC members. In explaining the Right of First Offer, the letter stated: "*A Right of First Refusal.* In the event a decision is ever made to sell the Club to an unrelated third party, it must be first offered to the Founding Members as a group. This precludes any future surprise changes in ownership." Deemer declared: "It was my intent in writing this letter to assure all those who chose to become Class A Founding Members . . . that control of the Club to an unrelated third party would not occur without the Founding Members, as a group, first being given the opportunity to purchase the Club."

Deemer declared he and Ray "undertook to rewrite the 'Governing Regulations,'" and they were amended as of September 1, 1987. Deemer declared "[t]he Right of First Offer in Article V, Section 2 . . . was revised to clarify that the right was to go to the Founding Members as a group ('any organization then in existence comprised solely of members . . .' . . . .)."

Larry Bemis became a Class A Founding Member of NBCC in 1985. He declared, based on his review of the October 22, 1985 letter, "I understood that the Class A Founding Members were given a right of first refusal providing that in the event the golf club was ever to be sold to an unrelated third party, it must first be offered to the Founding Members as a group."

Ronald G. Foster also became a Class A Founding Member of NBCC in 1985. He declared that in 1985, "I was offered the opportunity to purchase a 'Class A Founding Membership' in the golf club . . . providing the Founding Members with a right of first refusal that in the event the club was ever to be sold to an unrelated third party, it must first be offered to the Founding Members as a group."

Most of this extrinsic evidence is irrelevant under the objective theory of contracts. Conversations between Bouchey and Deemer, and conversations between Deemer and Ray, do not reflect NBCC's objective intent, disclosed to prospective Class A Founding Members. Bouchey did not identify whom she met in the fall and winter of 1985 and did not state whether those persons became Class A Founding Members. Deemer's, Bemis's, and Foster's undisclosed statements regarding intent or understanding of the Right of First Offer are irrelevant to contract interpretation under the objective theory of contracts. (*Winograd v. American Broadcasting Co., supra,* 68 Cal.App.4th at p. 632; *Berman v. Bromberg, supra,* 56 Cal.App.4th at p. 948.)

After winnowing out the extrinsic evidence that is irrelevant under the objective theory of contracts, only the October 22, 1985 letter from Deemer to prospective Class A Founding Members remains. The 1987 Governing Regulations is not reasonably susceptible, however, to the meaning for which Founding Members contends that letter is relevant. The letter stated: "In the event a decision is ever made to sell the Club to an unrelated third party, it must be first offered to the Founding Members *as a group.*" (Italics added.) Founding Members contends the phrase "as a group" means the Class A Founding Members have the right to exercise the Right of First Offer without the need to form a member organization. Such a meaning is contrary to the language of the 1987 Governing Regulations, which states the Right of First Offer can only be exercised by a "Member Organization . . . in existence." In addition, we disagree with Founding Members as to the meaning of the October 22, 1985 letter. We believe the phrase "as a group" in that letter is consistent with the terms "organization" or "Member Organization" found in the 1987 Governing Regulations and supports the conclusion the Class A Founding Members may exercise the Right of First Offer only "as a group"—a body distinct from the individual members. Thus, the October 22, 1985 letter was inadmissible under *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at page 37 as extrinsic evidence to prove the meaning urged by Founding Members. The letter would have been admissible to prove the meaning urged by NBCC, but it did not offer the letter and objected to its admission.

As explained above, when the evidence is not in conflict, the appellate court independently construes the contract. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d 861, 865; *Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.) Here, the only extrinsic evidence not rendered inadmissible by the objective theory of contracts is the October 22, 1985 letter, and that letter was inadmissible to prove the meaning urged by Founding Members. We

therefore independently construe the 1987 Governing Regulations and conclude the Right of First Offer can only be exercised by a member organization separate and apart from the existence of the Class A Founding Members themselves.

### 3. *Other Principles of Contract Interpretation*

Our construction of the Club's governing regulations comports with the principle that "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643; see *Powers v. Dickson, Carlson & Campillo, supra,* 54 Cal.App.4th at p. 1111.) It is reasonable to interpret the governing regulations as requiring NBCC to extend the Right of First Offer only to an organization separate and apart from the Class A Founding Members themselves. As NBCC explains, the requirement of an existing member organization protects those Class A Founding Members who do not wish to participate in purchasing the Club.

Extending the Right of First Offer only to an organization makes it capable of being carried into effect. Without a member organization, to whom would NBCC extend the Right of First Offer? Without a member organization, who would have the right to accept or reject the offer? Without a member organization, who would be bound if the Right of First Offer were accepted? Founding Members never adequately explains how its interpretation of the governing regulations addresses those issues.

Founding Members recites several principles of contract interpretation that it contends support its interpretation of the governing regulations. Founding Members argues that any ambiguities in the governing regulations must be resolved against NBCC because it drafted them (Civ. Code, § 1654) and that if "the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it" (Civ. Code, § 1649). We find the governing regulations unambiguous in requiring NBCC to extend the Right of First Offer only to an "organization then in existence" or a "Member Organization . . . in existence." Moreover, the promisee under the 1985 Governing Regulations and the 1987 Governing Regulations is a "Member Organization . . . in existence," not individual members.

Founding Members contends, "when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made." (Code Civ. Proc., § 1864;

see also *Mitchell v. Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033, 1042-1043 [229 Cal.Rptr. 535].) The Right of First Offer might be more favorable to Founding Members, but its construction of the Right of First Offer is not "equally proper" to NBCC's.

Founding Members also contends any ambiguities in the governing regulations must be construed against NBCC because the governing regulations are an adhesion contract. ▊ The term adhesion contract "signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694 [10 Cal.Rptr. 781].) ▊ The record does not disclose whether NBCC had superior bargaining strength, and the governing regulations do not appear to be a standardized agreement. But even accepting the proposition that a country club membership contract could be a contract of adhesion, we find no relevant ambiguities in the Right of First Offer in the governing regulations.

D. *No Member Organization Existed as of the Date of the PacPro Agreement.*

We agree with the trial court that no member organization under the terms of the 1987 Governing Regulations existed as of the date of the PacPro agreement in October 1999. The undisputed evidence shows that Founding Members did not exist as an organization until 2001, when its articles of association were prepared and signed. On August 3, 2001, Founding Members filed its statement by an unincorporated association and a fictitious business name statement. On August 31, 2001, a fictitious business name statement was filed for NBCC Golf Equity Committee.

Founding Members argues it "has existed as an unincorporated association since 1985 when the class of Founding Members was created by NBCC and two or more individuals accepted the offer and joined NBCC as Founding Members." (Fn. omitted.) ▊ The criteria applied to determine whether an entity is an unincorporated association are "(1) a group whose members share a common purpose, and (2) who function under a common name under circumstances where fairness requires the group be recognized as a legal entity." (*Barr v. United Methodist Church* (1979) 90 Cal.App.3d 259, 266 [153 Cal.Rptr. 322].) ▊ Groups identified in *Barr* as unincorporated associations include churches, labor unions, political parties, professional or trade associations, social clubs, and homeowners associations. (*Ibid.*) In *Barr*, for example, the court held the United Methodist Church, a national

church body, was an unincorporated association capable of being sued. (*Id.* at pp. 265-270.)

As of October 1999, the Class A Founding Members did not "share a common purpose" or "function under a common name." The Class A Founding Members did not "function" as a group at all. Unlike a religious body, labor union, political party, or even a social club, the Class A Founding Members as of October 1999 had never *done* anything as a group; they had not even met. The Class A Founding Members had no form of organization, no constitution, no bylaws, no rules of order, and no means by which they functioned under a common name. Those persons who joined the Club as Class A Founding Members were not an unincorporated association merely because they shared a common interest of playing golf: to be an unincorporated association they must have functioned as a group under a common name.

However, whether or not the Class A Founding Members were, as of October 1999, an unincorporated association capable of suing and being sued (as in *Barr v. United Methodist Church, supra,* 90 Cal.App.3d 259) is not, however, the issue. The issue is whether the Class A Founding Members came within the definition of an *organization* as required by the governing regulations to exercise the Right of First Offer. Although, as of October 1999, there were persons who were Class A Founding Members of the Club, there was no organization of such Class A Founding Members as referred to in the governing regulations.

Because no member organization existed as of the date of the PacPro agreement, NBCC was not required to—and could not—extend the Right of First Offer to the Class A Founding Members. The trial court therefore was correct to grant summary judgment in favor of NBCC on Founding Members' claims for breach of contract, specific performance, and declaratory relief.

E. *The Registration/Notice Issue.*

Founding Members and NBCC spend considerable effort debating whether Founding Members, or its constituent members, were required to provide, and did provide, notice under the Right of First Offer. The dispute arises out of the following language from the Right of First Offer in the 1987 Governing Regulations: "In the event the Owner shall, at any time, desire to offer part or all of its legal interest in the Club for sale . . . , Owner shall first extend the opportunity to purchase such interest in the Club to any organization then in existence composed solely of members or an organization of which at least fifty-one percent (51%) of the members or shareholders are then members of the Club, *each of whom shall have advised Owner in*

*writing of his election to become a shareholder or member of such 'Member Organization.'* " (Italics added.)

NBCC contends the phrase "each of whom shall have advised Owner in writing of his election to become a shareholder or member of such 'Member Organization'" applies both to (1) an organization consisting entirely of Class A Founding Members, and (2) an organization of which at least 51 percent of the members or shareholders are then members of the Club. Founding Members contends the phrase "each of whom shall have advised Owner in writing of his election to become a shareholder or member of such 'Member Organization'" applies only to an organization of which at least 51 percent of the members or shareholders are then members of the Club. According to Founding Members, if all members or shareholders of the member organization are country club members, then no such notification is required. Further, Founding Members asserts its members provided the requisite notice by submitting membership applications and paying dues.

We need not decide the issue. The 1987 Governing Regulations requires NBCC to extend the Right of First Offer only to a "Member Organization . . . in existence." As of October 26, 1999, the date of the PacPro agreement, neither Founding Members nor any member organization, as contemplated by the governing regulations, existed. Accordingly, NBCC did not breach the governing regulations by not extending the Right of First Offer to Founding Members, regardless whether or not any Class A Founding Member was required to, or did, notify NBCC of the member's election to become a shareholder or member of a member organization.

## II.

### *Founding Members Does Not Challenge Summary Adjudication of Its Injunctive Relief Cause of Action*

The trial court summarily adjudicated Founding Members' claim for injunctive relief, stating "neither Plaintiff nor its members suffered any irreparable harm nor are they presently facing any action that could be characterized as a retaliatory action so as to create a justiciable controversy." Founding Members does not address its injunctive relief claim and therefore has waived any claim of error. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [79 Cal.Rptr.2d 273]; *Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1021 [261 Cal.Rptr. 875].)

## DISPOSITION

The judgment is affirmed. NBCC shall recover its costs on appeal.

Bedsworth, Acting P. J., and Ikola, J., concurred.