Filed 12/16/25

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOANG LONG NGOC PHAM,<br><br>   Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF<br>ORANGE COUNTY,<br><br>   Respondent;<br><br>NOZOMI KON,<br><br>   Real Party in Interest. | G065471<br><br>(Super. Ct. No. 24D007427)<br><br>O P I N I O N |

Original proceedings; petition for writ of mandate to challenge an order of the Superior Court of Orange County, Robert F. Kohler, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Petition denied.

Hoang Long Ngoc Pham, in pro. per., for Petitioner.

---

* Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion.

No appearance for Respondent.

Nozomi Kon, in pro. per., for Real Party in Interest.

\*       \*       \*

In this case of apparent first impression in California appellate courts, we are called upon to resolve a dispute between a couple regarding what will happen to two frozen embryos—which they created under a written agreement with an in vitro fertilization (IVF) provider—now that their marriage is ending. The issue arose in the course of a marital dissolution action between Hoang Long Ngoc Pham and Nozomi Kon. Pham appeals an order awarding the embryos to Kon, who wishes to use them to attempt to bear a child. Asserting he no longer wants to father a child with Kon, Pham seeks to have the embryos discarded.

At the center of the dispute is the written agreement Pham and Kon entered into with their IVF provider when they embarked on the IVF process. The agreement is entitled "Informed Consent In Vitro Fertilization (IVF)" (IVF Agreement). (Some capitalizations omitted.) Among other things, it identified specific options for the disposition of the couple's frozen embryos created during the IVF process if specified "adverse event[s]" should occur. For the adverse event of legal separation or divorce, Pham and Kon were offered the option to thaw and discard the embryos. They did not select that option. They also did not select the options to donate the embryos for research purposes or to donate them to another specified person or couple. Instead, Pham and Kon selected the option "[m]ade available to the partner if he/she wishes." The trial court concluded the IVF Agreement was valid, clear, and unambiguous, and it awarded the embryos to Kon.

Although the order is not appealable, in the unpublished portion of this opinion, we exercise our discretion to treat the appeal as a petition for

2

writ of mandate. In the published portion of this opinion, we conclude that where, as here, the parties have entered into a valid contract specifying how frozen embryos created by IVF shall be treated in the event of divorce, the parties' contract governs. We conclude the trial court correctly interpreted the IVF Agreement and awarded the embryos to Kon. We deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

Based on the limited record provided to us on appeal, Pham filed a petition for marital dissolution in October 2024. In January 2025, he filed a motion to discard two embryos being retained by an IVF provider, and Kon filed a request for order (RFO) seeking immediate rights to the frozen embryos.[1]

On March 21, 2025, the trial court held an evidentiary hearing on Pham's motion and Kon's RFO. Pham testified he agreed to participate in the IVF process with Kon but asserted he has "the legal, moral right to change [his] mind and withdraw the consent before any embryos are creatively used." Kon wishes to have the embryos made available to her.

The trial court admitted the IVF Agreement as an exhibit. Pham testified he recognized the document and acknowledged he signed it. The beginning of the IVF Agreement stated Kon and Pham "freely consent to

---

[1] Neither Pham's motion, Kon's RFO, nor any of the related briefing in the trial court is included in the record on appeal. We note the title of Pham's motion indicates there are two embryos at issue and a prior motion to dismiss filed by Kon in this court also refers to two cryopreserved embryos. Both parties confirmed at oral argument only two frozen embryos are at issue. We further note some courts use the term "pre-embryos," instead of embryos, when "refer[ing] to eggs that have been fertilized using the IVF process but not implanted in a uterus." (See *In re Marriage of Rooks* (Colo. 2018) 429 P.3d 579, 582 (*Rooks*).) Because both the parties and the trial court used the term embryos to refer to the two frozen embryos at issue here, we do the same.

undergo an IVF procedure to attempt to obtain a pregnancy." The IVF Agreement included, among other things, a section entitled "ADVERSE EVENT: LEGAL SEPARATION OR DIVORCE," which listed under that heading the following four options: (1) "[m]ade available to the partner if he/she wishes"; (2) "[d]onated to another person or couple (specify name)"; (3) "[t]hawed and discarded"; and (4) "[d]onated for research."[2] The box next to the first option ("[m]ade available to the partner if he/she wishes") is checked, and there are two sets of initials next to that option. Pham testified one set of initials is his. Kon testified the other set of initials is hers and that she also signed the contract.

At the conclusion of the hearing, Pham requested the embryos be destroyed, whereas Kon requested the embryos be awarded to her. In a March 21, 2025 minute order, the trial court found the contract to be valid and unambiguous and awarded the embryos to Kon effective upon the signing of the order after hearing. The court's March 21, 2025 minute order directed Kon to prepare the order after hearing. On April 30, 2025, the court entered its findings and order after hearing, finding the IVF Agreement "valid, clear, and unambiguous" and awarding the embryos to Kon.

---

[2] The IVF Agreement includes two other adverse event provisions, each of which also provided specific options for how to proceed if the event occurred. One adverse event was the death of one partner with frozen embryos; the option "[m]ade available to the other partner if she/he wishes" was checked, with two sets of initials placed next to it. The other adverse event was the death of both partners with frozen embryos; the option "[d]onate to another person or couple (specify name)" was checked, with the name of Pham's daughter written in and two sets of initials placed next to it.

4

On May 1, 2025, Pham filed a notice of appeal.[3]

## DISCUSSION

## I.

### APPEALABILITY

We first address whether the order is appealable. An appellate court has jurisdiction over a direct appeal only when there is an appealable order or judgment. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.) "A trial court's order is appealable when it is made so by statute." (*Ibid.*)

In a prior order in this appeal, this court noted there did not appear to be a judgment entered in the dissolution proceedings. We therefore ordered the parties to address in their merits briefing whether the challenged order is appealable and whether this court should exercise its discretion to treat the appeal as a writ petition. In his opening brief, Pham does not assert the order is appealable. Instead, he "requests that this [c]ourt exercise its discretion to treat this appeal as a petition for writ of mandate" and asserts "the order effectively determines the rights of the parties with respect to the disposition and control of the embryos and has immediate and irreparable implications for [his] fundamental constitutional right not to procreate." In Kon's respondent's brief, she asserts this court should dismiss the appeal, but also asks that we "reach the merits and affirm the trial court's ruling." Kon

---

[3] Pham's notice of appeal stated he was appealing from the judgment or order dated March 21, 2025, which was the date of the trial court's minute order. "A minute order that directs the preparation of a formal written order is not itself appealable." (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 101.) We construe the appeal to be taken from the court's April 30, 2025 findings and order after hearing.

5

asserts "delaying resolution would inflict irreparable harm, given [her] advanced maternal age and limited reproductive window."

We conclude the order is not appealable. The record does not reflect judgment has been entered. The order also is not an appealable order under Code of Civil Procedure section 904.1. Indeed, neither party argues the order is appealable. Both parties, however, have urged us to reach the merits of the issue. "An appellate court has discretion to treat a purported appeal from a nonappealable order as a petition for writ of mandate, but that power should be exercised only in unusual circumstances." (*H. D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366–1367; see also *In re Marriage of Olson* (2015) 238 Cal.App.4th 1458, 1462.) Under the circumstances here, we exercise our discretion to treat the appeal as a petition for writ of mandate.

## II.

### THE TERMS OF THE PARTIES' IVF AGREEMENT CONTROL

*A. Standard of Review*

"'We interpret a contract so as to give effect to the mutual intention of the contracting parties at the time the contract was formed.'" (*Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 695; see also Civ. Code, § 1636.) "'We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. [Citations.] We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation. [Citation.] We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.] If contractual language is clear

6

and explicit and does not involve an absurdity, the plain meaning governs.'" (*Dowling*, at p. 695.) "The parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)

Whether a contract is ambiguous—i.e., reasonably susceptible to more than one interpretation—"is a question of law subject to independent review on appeal." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.) "Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. [Citations.] If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., supra*, 109 Cal.App.4th at p. 955.)

"We independently review the trial court's interpretation of a contract, including the resolution of any ambiguity, unless the interpretation depends on the trial court's resolution of factual questions concerning the credibility of extrinsic evidence." (*Dowling v. Farmers Ins. Exchange, supra*, 208 Cal.App.4th at p. 694; see also *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., supra*, 109 Cal.App.4th at p. 955 ["When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract"].)

Here, Pham has not cited any extrinsic evidence, much less shown with record citations that conflicting extrinsic evidence was presented

to the court. We therefore independently review the contract interpretation issue.

## B. The Trial Court Correctly Interpreted and Applied the IVF Agreement

The trial court determined the IVF Agreement was valid and unambiguous, and it awarded the embryos to Kon. We conclude the court correctly interpreted and applied the IVF Agreement.

Pham argues "the agreement did not expressly authorize [Kon] to use the embryos without [Pham's] future consent, particularly in the event of divorce or separation." He argues the phrase "'made available to the partner if he/she wishes' is inherently ambiguous and does not expressly waive the right to object post-divorce." According to Pham, the phrase "'made available'" "can mean transfer of custody for safekeeping, or conditional availability subject to mutual consent."

Pham's arguments are unavailing. Considering the IVF Agreement as a whole, the disposition of the embryos in the event of legal separation or divorce is clear and unambiguous. The IVF Agreement set out three "ADVERSE EVENT" scenarios, each with multiple options for what the parties wanted to happen to the embryos if such an adverse event happened.[4]

---

[4] The IVF Agreement also addresses adverse events concerning the death of one or both partners. Both of those sections begin with the phrase "[w]e (I) wish the frozen embryos be" and then list the options for disposition. We recognize the section addressing the adverse event of legal separation or divorce does not include the same prefatory language. Pham has not argued the lack of this clause makes the adverse event section for legal separation or divorce ambiguous or unclear; nor does he dispute that the disposition of the frozen embryos is the subject of that section. Reading the contract as a whole, as we must (see Civ. Code, § 1641), it is clear the options set forth in the paragraph concerning the adverse event of legal separation or divorce were intended to express the parties' wishes concerning the disposition of the frozen embryos under that particular scenario.

Under the adverse event "LEGAL SEPARATION OR DIVORCE," Pham and Kon selected and initialed the option "[m]ade available to the partner if he/she wishes." They did not select "[t]hawed and discarded."

We conclude the phrase "[m]ade available to the partner if he/she wishes" is unambiguous in this context, and the only reasonable interpretation is the embryos are to be made available to Kon, if she wishes, so she may use them for the stated purpose of the IVF Agreement—i.e., to attempt to obtain a pregnancy. We conclude Pham's alternative interpretation—that this clause only permitted Kon to take custody of the embryos for safekeeping and required further mutual consent for Kon to use the embryos to attempt to have a child—is not reasonable.[5]

Having concluded the trial court correctly interpreted the contract, we turn to Pham's arguments why the IVF Agreement should not control.

Pham asserts use of the frozen embryos to attempt to achieve a pregnancy requires contemporaneous mutual consent. In his view, embryos

_____

[5] At oral argument, Pham suggested we could not make any determination regarding disposition of the embryos under the IVF Agreement because the adverse event clause governing legal separation or divorce has not been triggered because the court has not yet entered an order dissolving the marriage. The record on appeal does not show Pham raised this issue in the court below, and he certainly did not raise it in his opening or reply briefs on appeal. The argument is therefore forfeited. (See *Coastline JX Holdings LLC v. Bennett* (2022) 80 Cal.App.5th 985, 1012 [argument not raised in trial court was forfeited]; *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 753 [party's new argument raised during oral argument was forfeited].) In any event, Pham made clear at oral argument that he filed the dissolution action and fully intends to obtain an order of dissolution. We note such an order can be sought by either party at any time, independent of any determination regarding division of assets and liabilities. (See Fam. Code, § 2337.)

cannot be used "for reproductive purposes unless both parties affirmatively consent at the time of use—regardless of any prior written agreements." Pham, however, cites no California authority supporting this proposition. Nor does he discuss the other approaches to this issue that other jurisdictions have adopted. There appear to be three leading approaches—the contractual approach, the balancing approach, and the contemporaneous mutual consent approach—to determine the disposition of frozen embryos upon divorce. (See *Bilbao v. Goodwin* (Conn. 2019) 217 A.3d 977, 984 (*Bilbao*); see also, e.g., *Freed v. Freed* (Ind.Ct.App. 2024) 227 N.E.3d 954, 965–967.)

Under the contractual approach, a court first looks to whether there is an enforceable agreement between the parties for the disposition of the embryos upon divorce; if there is, the court enforces the parties' agreement. (See *Bilbao, supra*, 217 A.3d at p. 984 ["Under the contractual approach, an agreement between progenitors governing disposition of the pre-embryos is presumed valid and enforceable in a dispute between them"]; *Kass v. Kass* (N.Y. 1998) 696 N.E.2d 174, 180 ["Agreements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them"].) As one court explained, "[p]roponents of the contractual approach primarily argue that this approach allows 'the progenitors—not the [s]tate and not the courts . . . [to] make this deeply personal life choice.' [Citation.] They also note that, by validating and enforcing a contract based rule, the approach promotes serious discussion between the progenitors in advance of divorce, gives progenitors and storage facilities a measure of certainty to plan for the future, and helps avoid costly and emotionally taxing litigation." (*Bilbao*, at p. 984.) That court, however, also noted "[c]ritics of this approach focus on the fact that pre-embryos can be stored indefinitely and

10

that progenitors might change their minds about disposition as time passes." (*Ibid.*)

Under the balancing approach, courts weigh the parties' respective interests. (See *Rooks, supra*, 429 P.3d at pp. 581, 593; see also *Bilbao, supra*, 217 A.3d at 985.) For example, the Colorado Supreme Court has articulated several non-exhaustive factors to consider, including "the intended use of the party seeking to preserve the disputed pre-embryos" and the ability "of the party seeking to implant the disputed pre-embryos to have biological children through other means." (*Rooks*, at p. 593.) Some courts use the balancing approach only where there is no enforceable agreement between the parties. (See *id.* at pp. 581, 592–593; see also *Bilbao*, at p. 985 ["most courts use the balancing approach as a second step, only to be employed after it is determined that no enforceable agreement between the progenitors exists and, thus, that the contractual approach does not resolve the issue"].)

Under the contemporaneous mutual consent approach, both parties must agree, at the time of disposition of the embryos, to what will be done with them, and if they cannot agree, the status quo is maintained. (*In re Marriage of Witten* (Iowa 2003) 672 N.W.2d 768, 783.) Pham asserts "[t]he overwhelming majority of courts that have confronted embryo disputes endorse the mutual contemporaneous consent model." But he cites only two cases adopting that approach. (See *Witten*, at pp. 781–783; see also *A.Z. v. B.Z.* (Mass. 2000) 725 N.E.2d 1051, 1057–1058 & fn. 22 [noting "even had the husband and the wife entered into an unambiguous agreement between themselves regarding the disposition of the frozen preembryos, we would not enforce an agreement that would compel one donor to become a parent against his or her will" but expressing no view on the enforceability of an

11

agreement over a contemporaneous objection when the agreement specifically contemplated destruction or donation of the preembryos].)[6]

Here, neither party has cited a published California appellate decision directly addressing the applicable approach under California law for determining the disposition of frozen embryos upon divorce; nor have we found one.[7] The precise issue before us appears to be one of first impression in the appellate courts of this state.

We conclude that where, as here, the parties have entered into a valid contract specifying how the frozen embryos shall be treated in the event of divorce or legal separation, the contractual approach governs. The contractual approach "'minimize[s] misunderstandings and maximize[s] procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision.'" (*Rooks, supra*, 429 P.3d at p. 592.) There are also "significant benefits to making this decision in advance, rather than at the moment of disposition.

_____

[6] Pham also cites *J.B. v. M.B.* (N.J. 2001) 783 A.2d 707. In that case, the New Jersey Supreme Court stated it would "enforce agreements entered into at the time in vitro fertilization is begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored preembryos" (*id.* at p. 719), but it noted a form of the balancing approach would apply if the parties disagree. (*Ibid.* ["if there is disagreement as to disposition because one party has reconsidered his or her earlier decision, the interests of both parties must be evaluated"].)

[7] California appellate courts have addressed certain other issues related to embryos. (See, e.g., *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410, 1412 [addressing who are the lawful parents where genetically unrelated embryo is implanted in a surrogate]; see also *Robertson v. Saadat* (2020) 48 Cal.App.5th 630, 632, 645 & fn. 12 [addressing whether the plaintiff was entitled to use her deceased husband's sperm but explicitly "express[ing] no opinion regarding the donors' respective rights if the gametic material at issue was the product of two donors, such as a preembryo"].)

12

Preexisting agreements 'promote serious discussions between the parties prior to participating in in vitro fertilization'; [citation]; and manifest choices 'made before disputes erupt . . . .' [Citation.] This 'minimize[s] misunderstandings' that might arise in the future, provides certainty for progenitors and fertility clinics, and decreases the likelihood of litigation." (*Bilbao, supra*, 217 A.3d at p. 986.)

Moreover, the contractual approach is consistent with California's articulated public policy. California law requires a health care provider that is providing fertility treatments to give "a form to the male and female partner, or the individual without a partner, as applicable, that sets forth advanced written directives regarding the disposition of embryos," including certain choices in the event the partners separate or divorce. (Health & Saf. Code, § 125315, subd. (b).)[8] Even if that statute is not dispositive of the issue here, it strongly supports the contractual approach.

Pham also argues that, even if the IVF Agreement can properly be read to give control of the embryos to Kon, enforcing it would violate public policy. We cannot agree. As discussed above, Health and Safety Code section 125315, subdivision (b) supports a conclusion that California public policy favors the contractual approach. In the face of a legislative requirement that IVF providers give their patients forms to specify in advance how frozen embryos would be treated in the event of separation or divorce, it would be nonsensical for us to conclude it would be contrary to the policy of this state to enforce the parties' resulting advance directives. Here, Pham

---

[8] Under Health and Safety Code section 125315, subdivision (b), one of those circumstances is the "separation or divorce of the partners," and the choices for disposition include "[m]ade available to the female partner" and "[m]ade available to the male partner." (*Id.*, subds. (b)(3)(A)–(B).)

13

acknowledged in writing that he "freely consent[ed] to undergo an IVF procedure to attempt to obtain a pregnancy" and agreed the resulting frozen embryos would be made available to Kon, if she wished, in the event of divorce or legal separation.[9] We find no policy in California that is antithetical to the enforcement of such an agreement.

Additionally, Pham argues "California's constitutional privacy right under [a]rticle I, [s]ection 1 strongly supports" his position. According to Pham, enforcing the IVF Agreement would violate his right not to procreate, and "[b]ecause the right not to procreate is a fundamental right, any infringement by the state must survive strict scrutiny." Pham contends "[t]he trial court failed to conduct any constitutional balancing or apply strict scrutiny," and he asserts there is no compelling state interest and the order is not narrowly tailored.

Pham has forfeited this argument. Pham does not demonstrate where he raised this argument in the trial court, and based on our review of the record he provided on appeal, we find no indication he sufficiently raised

---

[9] Pham cites *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 and Civil Code section 1668, but neither supports Pham's argument. Civil Code section 1668 states "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (*Ibid.*) *Tunkl* concerned an exculpatory provision of a contract that fell within the proscription of Civil Code section 1668. (*Tunkl*, at pp. 94–95.) Civil Code section 1668 is not implicated by the enforcement of the IVF Agreement.

the issue so as to require the court below to rule on it.[10] (See *Coastline JX Holdings LLC v. Bennett, supra*, 80 Cal.App.5th at p. 1012; *People v. Patton* (2019) 41 Cal.App.5th 934, 946 ["as-applied constitutional challenge is forfeited unless previously raised"].) Moreover, although Pham generally argues on appeal his right not to procreate is infringed and strict scrutiny applies, he has forfeited this argument by failing to provide developed argument, with applicable case authority, to support this claim.[11] (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 620 ["'[w]hen an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived'"].)

---

[10] At most, the record on appeal reflects that, when the trial court asked at the hearing if Pham had any final arguments, he asserted he "feel[s] [it is] [his] constitutional right to choose to be a father when [he] want[s] to be, not forcefully to procreate with somebody that [he] choose[s] not to be a life partner with or to spend the rest of [his] life with." Pham's general concluding argument about what he "feel[s]" is his constitutional right, without citation to any applicable authority, was insufficient to preserve the issue for appeal. (See *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 770 [argument raised in a "cursory manner" in a brief and otherwise undeveloped is insufficient to preserve issue for appeal].)

[11] The cases Pham cites on appeal in support of his strict scrutiny assertion are both inapposite. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35, 39–40 [holding NCAA's random, mandatory drug testing program for collegiate athletes does not violate athletes' state constitutional right to privacy]; *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 314 (plur. opn. of George, C. J.) [holding statute requiring a pregnant minor to obtain parental consent or judicial authorization to obtain an abortion violates the state constitutional right to privacy].)

15

## DISPOSITION

The appeal is treated as a petition for writ of mandate and the petition is denied. Real Party in Interest Nozomi Kon shall recover costs on appeal.

GOODING, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

SCOTT, J.