Filed 8/4/14  Falbo v. Board of Administration CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NADINE FALBO, | |
| Plaintiff and Appellant, | E057487 |
| v. | (Super.Ct.No. CIVDS1114104) |
| BOARD OF ADMINISTRATION et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County.  David Cohn and Valera Johnson, Judges.*  Affirmed.

Law Offices of Nigel Burns, Nigel Burns, and Erin A. Huang, for Plaintiff and Appellant.

Rory J. Coffey for Defendants and Respondents.

*Judge David Cohn presided over the denial of the petition for writ of mandamus; Administrative Law Judge Valera Johnson conducted the hearing.

1

Plaintiff Jo Ann Bailey had been a professor at Riverside County Community College which made her eligible to purchase long-term care insurance from the California Public Employee Retirement System (CalPERS) under the Public Employee's Long-Term Care Act. The program was administered by the CalPERS Board of Administration (Board). Bailey suffered from Parkinson's disease, and as her health deteriorated, she required in-home care for activities of daily living (ADL) such as dressing and eating. In 2002, her long-time friend, Nadine Falbo, was approved by the Board to be an independent provider (IP) of home health care and Bailey would receive benefits under her long-term care insurance in order to pay Falbo.

In 2009, the Board became concerned about the arrangement. Falbo was both the IP for Bailey and was controlling her finances. Bailey had become cognitively impaired and the Board was concerned that Bailey could no longer manage Falbo. Bailey would be denied benefits if she continued using Falbo as her IP. Bailey appealed the decision, and after an administrative hearing, the denial of benefits was upheld by the administrative law judge (ALJ) who heard the claim (decision). Bailey filed a petition for writ of administrative mandamus (writ) in the trial court and the decision was upheld.

Bailey filed an appeal from the denial of her writ. While this appeal was pending, Bailey passed away. On July 1, 2013, we granted Falbo's request to substitute in as

2

plaintiff and appellant for Bailey based on Falbo's representation that she was the successor in interest as she was the beneficiary to Bailey's estate.[1]

The sole claim raised in this appeal is that the decision upholding the termination of Falbo as the IP was not supported by substantial evidence, and therefore, the writ was improperly denied. We affirm the denial of the writ.

I

FACTUAL AND PROCEDURAL BACKGROUND

The facts are taken from the writ proceedings and the administrative record (AR) that has been transferred to this court.

A.      *Bailey Obtains Long-Term Care Insurance From CalPERS*

The Board is charged with administration of the long-term insurance program for CalPERS. CalPERS hired the Long-Term Care Group, an independent company, to administer the program for the Board. At some point, Univita Health took over management. Each public employee who purchases coverage under the plan is given an Evidence of Coverage (EOC) packet.

On September 21, 1995, Bailey was approved by the Board to receive long-term care insurance. She was provided with the EOC. The EOC provided that benefits would be paid for, among other reasons, cognitive impairment or a deficiency in ADLs, including bathing and dressing.

---

[1]      Although Falbo has substituted in for Bailey, we will refer to the plaintiff and appellant in this case as Bailey.

The EOC provided a definition of the Plan of Care (POC) as follows: "Plan of Care means a written individualized plan of services approved by a **Care Advisory Services Agency** designated by **Us** which specifies **Your** long-term care needs and the type, frequency and providers of the services appropriate to meet those needs, and the costs, if any, of those services. The **Plan of Care** will be modified as required to reflect changes in **Your** medical or social situation, **Your** functional, behavioral or cognitive abilities, and **Your** service needs."

The EOC also defined eligibility for home health care. It provided for use of a home health care agency to provide in-home care. This agency would provide qualified and trained caregivers and would be licensed. When such agency was not available in an area, a person could receive care directly from an individual licensed to provide home health care services.

The EOC also had a rider policy entitled Alternative Care Payment Provision (ACPP). It provided, "**We** reserve the right to authorize benefits for providers, treatments, or services not otherwise specified in the Evidence of Coverage . . . ." This was a catch-all provision that would authorize the use of an IP to care for someone. It provided for this care if it was (1) cost effective; (2) appropriate to the person's needs; (3) consistent with general standards of care; and (4) provided the person with equal or greater quality of care. The ACPP provision also provided, "We also reserve the right to decline to authorize alternative benefits and services." If benefits were denied, there was a right to appeal. When benefits were being paid, no premiums were due.

4

B.      *Bailey Is Granted Benefits and Falbo is Affirmed as an IP*

On June 12, 2002, Bailey was assessed and was diagnosed as having Parkinson's disease. A mental capacity evaluation was performed. She was able to answer all of the questions posed to her during a mental evaluation except the current date. She also could not do math. She needed assistance with preparation of food, bathing, and going to the bathroom. She needed supervision with money management. She was able to write and draw with her eyes closed. Bailey was requesting an IP and wanted Falbo to be approved to help her.

On June 25, 2002, Bailey was approved for benefits due to her loss of functional capacity to perform three ADLs. On June 28, 2002, Bailey was approved for an IP under the ACPP. According to the approval letter, the IP would continue as long as the items in the EOC were complied with. Bailey was to execute a release of liability as the employer of the IP. Bailey was informed she had to provide time sheets for the IP, at least monthly. She also had to provide proof of payment to the IP. The Board advised Bailey that benefits would not be paid directly to the IP; Bailey would be reimbursed for payments made to the IP.

Bailey signed the long-term care program release of liability form. It included the following language: "A Care Manager must recommend the Plan of Care to be provided, and must remain involved to monitor the appropriateness of the Plan of Care and the Independent Provider on an ongoing basis. CalPERS reserves the right to terminate approval of a Plan of Care at any time if the Care Manager determines that use of any

5

Independent Provider is no longer appropriate." The Care Manager at the time was Kelly Peterson.

Between 2002 and 2008, Falbo was authorized to be an IP for Bailey under the ACPP.

### C. *The Board Seeks to Terminate Falbo as the IP*

In 2008, the Board began investigating the care received by Bailey under the plan based on an assessment of Bailey in which she had forgetfulness and confusion. On June 10, 2008, it sent Bailey a letter informing her that she was not sending the Board the required monthly timesheets. It stated that the timesheets and proof of payment must be received at least once per month. Bailey was reminded that timesheets must be accurate, and if they were not, it was sufficient cause to terminate the IP. Bailey was advised that if the timesheets were not properly submitted, it could result in the POC not being approved and reimbursed.

On February 17, 2009, the Board notified Bailey that it was no longer willing to provide benefits under the ACPP if Falbo was the caregiver; Bailey needed to find an alternative caregiver. It included as reasons that there was not a competent adult other than the IP who could assume management of the IP relationship; the IP was managing both the care needs and finances of Bailey; the IP managed a business from the home while reportedly providing "24/7" care; and the IP was paid from an account that was jointly owned by the IP and Bailey.

Bailey's attorney responded to the notice of cancellation. Bailey argued that under the terms of the EOC for cancellation, there were no grounds to terminate Falbo as the IP.

6

Bailey submitted numerous letters from doctors, therapists and Bailey's relatives confirming that Falbo was taking "exemplary" care of her and that removing Falbo as the IP would be detrimental to Bailey's health. Tina McGowan, Bailey's CPA, provided a letter that she would take care of the finances and write checks to Falbo. Adult Protective Services of San Bernardino County had investigated for any elder abuse and found none in the care or financial records. Falbo had help with her work and most of the work from the home involved telephone calls. Falbo owned the home in which the two were living. Further, based on their remote location in Joshua Tree, there were no other caregivers qualified to help Bailey.

The Board again notified Bailey that Falbo could no longer act as the IP. The Board alleged that Falbo had advised it that she and Bailey had comingled accounts and she wrote checks on the account. If Falbo continued as the IP, benefits would not be paid beyond March 15, 2009. As of March 30, 2009, the claim would be closed and Bailey would have to pay premiums.

On June 2, 2009, a clarification questionnaire sent by the Board to Bailey was completed and signed by Kathie Browne, an attorney representing Bailey. Browne provided that cancelled checks showing payment to Falbo could be provided. McGowan was able and willing to manage the supervision of the IP for Bailey. McGowan was also employed by Nadine Enterprises, owned by Falbo, as her business accountant. Ray Jayne Flores took care of Bailey when Falbo was not available. Falbo was away from Bailey approximately two times per week for three to eight hours. Falbo paid for Flores's

7

services.  It was admitted that at least since December 2008, Falbo had been paying herself from Bailey's checking account.

An assessment of Bailey was completed by a registered nurse on May 18, 2009.  Bailey was 81 years old at the time.  Bailey needed assistance with walking, showering and other activities requiring her to be ambulatory.  Bailey was unable to recall the date, the year or day of the week.  She could not perform a math calculation.  She did not know what State she was living in.  She refused to identify household objects.  Her primary care physician submitted a document that stated she had substantial dementia.  The onset of such cognitive impairment began in March 2008.

The Board notified Bailey on July 21, 2009, that it was clear from the assessment that she needed care both for her moderately/severe cognitive impairment and inability to perform ADLs.  Benefits would be extended for six months, but Bailey could not use Falbo as the IP and care under the ACPP was not appropriate.  The Board also stated it had spoken with Flores.  Flores advised the Board that she provided care at least two days per week during the day.  However, the timesheets submitted only showed that Falbo was the caregiver.  Flores was not an approved IP.

On August 12, 2009, a company called Visiting Angels sent an invoice to the Board requesting reimbursement for care for Bailey.  They sought reimbursement for eight hours a day for most days in July 2009.

Bailey appealed the decision to terminate Falbo as the IP.  Any inaccuracies on the timesheets were merely clerical errors.  On October 28, 2009, the Board, in response to Bailey's appeal of the decision to terminate Falbo, sent Bailey a letter outlining the

8

reasons for denying Falbo as the IP. It claimed it was based on Bailey's cognitive impairment and inability to manage an IP. This was supported by the cognitive questionnaire completed by Bailey's attorney, the eligibility assessment performed by the registered nurse, a telephone interview with Flores on June 17, 2009, tax returns submitted by McGowan, proof of payments for Bailey's care from 2002 through 2009, and an IP packet submission received October 2, 2009. The Board complained that Falbo was completing her own timesheets and signing her own payment checks. McGowan representing Bailey was a conflict of interest because she also represented Falbo. Also, Flores had taken care of Bailey on days that Falbo had put on her timesheet that she was taking care of Bailey. Bailey was advised that she could appeal the decision.

On November 23, 2009, Bailey sought an administrative hearing on the denial. Bailey argued that McGowan was taking care of Bailey's finances. There was no conflict of interest despite the fact McGowan was working with both Falbo and Bailey. Further, the timesheets could easily be corrected and did not impact the quality of care. Flores was unavailable for questioning. Bailey's health care directive stated she wanted to be cared for in her home.

D.    *Pre-Hearing Brief*

Bailey filed a brief in anticipation of the hearing that was to be held on February 4, 2011. Bailey was now 82 years old. She had worked as a Professor Emeritus at Riverside Community College. She was never married and had no children. Her brother also had Parkinson's disease and she had some cousins. Falbo took care of Bailey 90

9

percent of the time since 2002 and left her in the care of a responsible adult when she was unavailable.

As damages, Bailey sought reimbursement for care provided by Falbo since benefits were discontinued, and the amount she paid in premiums once her claim for benefits was closed. On January 12, 2010, the benefits claim was terminated. A past due amount of premiums in the amount of $1,414 had been paid. Also, Bailey had paid monthly premiums in the amount of $202 from February 10, 2010 through January 31, 2011. Falbo had continued to care for Bailey and Bailey sought reimbursement for the care.

E.    *Hearing*

On February 4, 2011, the matter was heard before an ALJ. Bailey and Falbo were present at the hearing. Exhibits were presented to the ALJ.[2]

Angela Forsell was employed by Univita Health. She was a vice president of clinical services. Univita was responsible for quality assurance and auditing of CalPERS long-term insurance claims. Univita managed 4,500 open CalPERS long-term care claims. Of the 4,500 claims, only 340 involved an IP.

Forsell became involved with Bailey's case at the end of 2008 when a reassessment of her benefits was completed. Forsell explained that in order to determine if benefits were to be paid, there was a determination of eligibility of the claimant and the provider. It was important to update or change a plan if the claimant needed different

_____

[2]    The exhibits have not been transferred to this court but most of the documents in the exhibits are in the AR.

10

care. In-home assessments of claimants receiving benefits were periodically conducted along with a review of time sheets and invoices from the claimant.

Bailey enrolled in the program in 1995. She had an unlimited lifetime benefit. A claimant was eligible under the program if he or she could not perform ADLs, had cognitive impairment or had a stable but complex medical condition. An IP was considered an exception to the normal care. Normal care consisted of a home health care agency or a licensed and certified provider.

Bailey was approved for benefits in May 2002. She was approved on the basis of needing assistance with ADLs. Forsell noted that Bailey signed the acknowledgment of terms and release of liability form for an IP. Forsell noted that the form included that CalPERS long-term care reserved the right at any point to determine the arrangement was no longer appropriate under the exception, and could terminate approval of the POC.

Falbo was approved as the IP from May 2002 until early 2009. Falbo was disapproved as the IP. Bailey did not get a new, eligible provider so her benefits were terminated in January 2010. Bailey continued to be eligible for benefits under the plan; however, she could not use Falbo as the IP.

Forsell claimed that one of the reasons Falbo was not allowed as an IP was the sporadic submission of timesheets or untimely submission. Forsell admitted that Falbo had written checks to herself from Bailey's checking account during the entire time period she served as the IP. However, in 2008, a reassessment was done on Bailey and it was discovered that she required supervision as a result of cognitive impairment. The care manager contacted Bailey to determine whether she was aware of the amount of

11

money that Falbo was paying herself from her checking account. During the conversation, Bailey appeared confused and was unable to respond to the care manager's satisfaction that the arrangement was with her permission and approval. As a result, Falbo was terminated as the IP.

Bailey's cognitive impairment had been diagnosed in March 2008 as a result of the advancement of her Parkinson's disease. During the Board's investigation of the reconsideration of the decision, Forsell discovered that Bailey was receiving care from someone other than Falbo. The form completed by Bailey's lawyer, Browne, confirmed that another individual was providing care to Bailey.

Forsell noted that Bailey, when originally approved for an IP, had only needed assistance with ADLs. However, since that time she had cognitive impairment which foreclosed her from properly managing an IP. Bailey would need an individual to assist her in managing an IP. Falbo would not be approved as an IP because of her recordkeeping which included inaccurate statements that she was providing care when Bailey was receiving care from another individual. This was confirmed by Bailey's attorney.

Forsell could not say for sure that based on the tests originally given to Bailey in 2002 she showed signs of cognitive impairment. However, even if there was some showing of cognitive impairment, Forsell noted that at the time Bailey was approved, she signed all of the appropriate documents. She appeared competent to manage an IP. The first sign of cognitive impairment recognized by CalPERS was in 2008. Bailey's own attorney stated the diagnosis of dementia was in March 2008.

12

Falbo only submitted timesheets for 70 hours per week care (CalPERS only paid for that amount) but Bailey required 24 hour a day care. Forsell admitted it was not improper for the IP to pay someone to care for the claimant. The issue here was that Falbo put on her timesheets specific times she was working and the questionnaire showed Flores was actually working during that time.[3] Forsell admitted that the questionnaire only stated Flores provided care for ten hours a day on Tuesdays and Thursdays but no specific times were given; there were 14 other hours of care needed which were provided by Falbo. The care Bailey received was not considered in the decision which terminated Falbo as the IP.

Dr. Robert Neal Rouzier primarily worked with elderly patients. He saw Bailey at least once per month. She was always accompanied by Falbo. Bailey essentially was unable to perform any functions. She could sit and open her eyes. She had to be watched or she could fall out of her chair and hurt herself. She required round-the-clock care. Bailey would become agitated if Falbo was out of her sight. Bailey was always clean and well taken care of.

McGowan testified she had been a CPA for 32 years. Falbo and Bailey had been her clients since 2005. In 2005, when McGowan was hired, Bailey was able to communicate and hire her directly. McGowan completed Bailey's tax returns. She also paid Bailey's caregivers. She started paying Falbo in February 2009. McGowan saw no

___

[3] The evidence that Flores was actually working during the time on the timesheets was provided by Forsell. Forsell stated that a care manager had talked to Flores and confirmed with Flores that she worked the hours on the submitted timesheet. The ALJ marked this testimony as hearsay.

13

financial irregularities between Falbo and Bailey. McGowan would pay Falbo if Falbo continued as the IP. McGowan admitted it presented a potential conflict of interest if Falbo was both writing and receiving checks. McGowan received the authority to write checks from Falbo because she had power of attorney over Bailey. If McGowan took over writing checks to Falbo, she would rely on timesheets submitted by Falbo.

Dr. Terre York was a chiropractor and cared for Bailey from September 2009 until May 2010. He made some house calls. The care provided by Falbo, and the equipment for her care in the house, were excellent.

Nadine Falbo testified. She had known Bailey since 1985. Bailey needed help with everything, including eating, going to the bathroom and walking. Falbo had to give Bailey daily medication injections. Bailey needed help in the middle of the night.

Falbo had other caregivers help her; she told her care manager Peterson about the other caregivers and she approved. Falbo was never told that she could not hire outside caregivers for Bailey. Falbo always put 10 hours as the time she worked each day although she worked much longer. Falbo and Bailey had a joint checking account for household expenses in which they both deposited money. Falbo was beneficiary of Bailey's pension.

Falbo went on vacation by herself in 2006 and 2008 and did not take Bailey with her. Falbo admitted she did not provide the care during this time but had stated on timesheets submitted to the Board that she provided the care. She admitted that she needed to reimburse Bailey for this period of time.

14

In July 2009, Falbo enlisted a company called Visiting Angels to bill for the care she provided and the Board reimbursed for that time in July 2009. Falbo had a business but had very little work since 2002 and she worked out of her home.

At some point after 2002, Bailey was incapable of handling her finances. Falbo claimed she took over Bailey's bank book in 2002. However, she could not say that Bailey could not take care of her financial affairs at that time. Falbo noted Bailey's Parkinson's disease got worse after surgery in 2006.

Falbo prepared the timesheets and McGowan just signed them. Falbo admitted that she submitted timesheets that showed she cared for Bailey but some other caregiver had provided care to Bailey. She claimed she was told by Peterson to just put her name because she provided 24 hour care. She always worked at least 10 hours a day. Falbo admitted that Flores worked about 55 to 60 hours a month in the end of 2008.

Timothy Scott Blevins was Bailey's financial advisor and had many elderly clients. In his opinion, it was better for patients who needed long-term care to stay in their homes. It cost more to have a home health care agency monitor a home provider. Blevins noted that in the prior two years Bailey had been unable to deal with her own financial affairs. Falbo provided exemplary care for Bailey.

Forsell was recalled. The Board issued a check to Bailey for the Visiting Angels invoice; it believed that the care was from the agency. Forsell continued to have concerns about having to rely upon documentation submitted by Falbo.

15

F.    *Post Hearing Briefs and Argument*

The Board filed a post hearing brief on April 7, 2011. They did not seek to deny Bailey benefits or home care; the Board only sought to remove Falbo as the IP. They alleged that Bailey was not cognitively impaired in 2002 when the IP was originally approved. Further, the IP was subject to change. They argued that sometime in 2008 Bailey became unable to manage her affairs due to cognitive impairment and could no longer manage the IP. The Board was concerned that Falbo had power of attorney over Bailey and was writing checks to herself.

The Board cited several reasons to terminate Falbo as the IP, including that: (1) Falbo and Bailey had comingled assets; (2) Falbo made material misrepresentations by not advising the Board that Flores was providing care to Bailey; (3) Falbo enlisted Visiting Angels to submit timesheets and invoices to the Board when Bailey did not receive care from the facility; and (4) McGowan could not take over management of Bailey's care because she had a conflict of interest and McGowan relied upon Falbo to provide her with the hours she worked.

Bailey made a written closing argument which was filed on March 17, 2011. Bailey claimed the care manager, Peterson, instructed her to just put Falbo as providing care. Moreover, the Board was aware from the beginning there was cognitive impairment. Further, the language in the ACPP only referred to deficiency in care, not concerns about finances.

Bailey also filed a reply brief on April 8, 2011. The Board had not cited sporadic timesheets in its original termination letter. Falbo wrote checks to herself for years

16

before the Board complained.  Further, since the Board never brought forth Flores to testify, any statements by her were hearsay.

G.  *Statement of Decision*

The ALJ submitted its proposed decision on July 28, 2011.  It noted that the parties had submitted closing argument in writing which was accepted.  The ALJ found that the Long-Term Care Act was enacted by the California Legislature in 1990 to establish voluntary insurance for long-term care.  The program required that the Board administer the program.  Univita Health managed the plan for the Board.  Maintaining and enforcing adequate criteria for receipt of benefits was part of the Board's fiduciary duty to its members.  The Long-Term Care Act provided that the Board could adopt underwriting standards and benefit criteria for the program.  The ALJ then set forth the language in the EOC that involved the use of home health care providers and the language in the ACPP for alternative providers.

The ALJ also referred to the release of liability form signed by Bailey that included language that the Board reserved the right to terminate the POC and IP.  The ALJ also referred to the language in the termination letter dated February 1, 2009.

The ALJ then reviewed Forsell's testimony, including that Falbo had submitted timesheets on a sporadic basis, Falbo wrote checks off of Bailey's account, that a licensed clinical social worker had spoken with Bailey and she was confused and could not confirm the payment arrangement, and that Flores provided care.  The ALJ also referred to evidence that in March 2008, Bailey was diagnosed with cognitive impairment.

17

The ALJ found it was undisputed that Falbo provided exemplary care to Bailey. The ALJ also reviewed Falbo's testimony. There was no evidence that Falbo wanted to defraud or deceive the Board. The ALJ found there was some evidence of cognitive deficit in 2002 but it was not established Bailey had cognitive impairment as defined in the EOC. She was approved for benefits in 2002 based on the inability to do ADLs, not because of cognitive impairment. There was no evidence in the record of Bailey's lack of cognitive ability before late 2008.

The ALJ stated, "It would be beneficial for [Bailey] to continue to receive personal care services provided by Falbo. However, given the terms of the EOC and the ACPP and the foregoing facts, CalPERS cannot be compelled to approve Falbo as [Bailey]'s IP." It also found, "CalPERS makes an effort to administer the ACPP of the EOC consistently for all members. Individuals who are cognitively impaired and who do not have an accountable, independent adult managing the employer/employee relationship are not approved for a Plan of Care that includes an IP. Out of consideration to others covered under the Program, due to CalPERS' obligation to administer the Program consistently, it is not unreasonable for CalPERS to refuse to continue to approve Falbo to be the IP for [Bailey] as an exception under the ACPP." The final order stated, "The appeal of Jo Ann Bailey of the denial of her request to have Nadine Falbo as her Independent Provider of personal care services is denied."

The decision was presented to the Board. Bailey, through her newly acquired representative, Arlene Falbo-Hermosillo, objected to the decision. Bailey submitted

18

Falbo's certificate of completion in residential care for the elderly and that she had obtained a bond.**4** On September 19, 2011, the Board adopted the Decision.

H.     *Appeal of the Statement of Decision*

On October 17, 2011, Bailey filed a petition for reconsideration. Bailey claimed essentially that the decision was not supported by evidence based on the claimed reasons for terminating Falbo as the IP and that the EOC had been improperly interpreted against her. The Board denied the reconsideration petition.

I.     *Petition for Writ of Administrative Mandamus and Denial*

On December 15, 2011, Bailey filed her writ. Bailey contended that review was de novo because the writ involved a fundamental vested right. Bailey argued that Falbo provided exemplary care. The Board terminated based only on administrative reasons that could be easily remedied. All of the reasons for termination listed in the Board's first letter could be easily remedied but it refused to allow the remedies. After addressing these concerns, the Board cited to new reasons such as sporadic timesheets, commingling of funds, and Bailey's cognitive impairment. The evidence at the hearing did not support terminating benefits on these grounds. Bailey requested that Falbo be continued as the IP and that she receive past benefits and premiums.

---

**4**     A Board staff member submitted a written recommendation to the Board on the reconsideration of the decision. The staff member noted that Falbo had obtained certification to be a home health care provider and would potentially qualify under the EOC to provide care. The staff member noted that this had occurred after the denial of the benefits and Falbo should reapply for a POC with Univita. It is unclear if Falbo ever reapplied. The staff member stated that Falbo's licensing would not be retroactive or impact the Decision.

The Board filed a reply. The Board argued the standard of review was substantial evidence. Bailey was not denied benefits. She had no vested right to have Falbo as her IP. The Board argued that the EOC was the contract. Under the ACPP, which was part of the EOC, the Board had the discretion to approve or decline to approve the alternative benefits. Further, her POC also included language that it was not a guarantee of benefits and that it could be amended as care needs changed. Bailey could not have compelled the Board to allow an IP in 2002 when she initially received approval much less compel it to continue to approve an IP.

The evidence did not support that Bailey was cognitively impaired in 2002. Falbo admitted that she submitted timesheets stating she provided care when others were providing care. Falbo also admitted going on vacation without Bailey but billing for Bailey's care. Sometime in 2008, Bailey no longer had the mental capacity to make financial and health care decisions. Falbo refused to provide the date when Bailey became incompetent. Further, since Bailey gave Falbo power of attorney prior to her mental incompetency, Falbo was acting as both employer and employee. There was a conflict of interest because Falbo was paying herself from Bailey's funds. McGowan admitted that she would only sign the timesheets provided by Falbo and sign checks; McGowan would not serve as a monitor to ensure the timesheets were accurate.

Bailey filed a reply. Bailey argued that removal of Falbo as the IP affected her fundamental, vested right. Bailey rejected that the evidence presented at the trial supported the findings of the ALJ. Bailey insisted there was no conflict of interest.

20

The hearing on the writ was conducted on July 31, 2012. The trial court stated that it believed long-term care benefits involved a vested right and that the proper standard of review was independent judgment. The trial court found that the findings made by the ALJ were supported by the evidence presented at the hearing. The important indication was that Falbo had a conflict of interest, which was evidenced by the timesheets and "payment protocol." These questions of payment were raised in light of the cognitive impairment suffered by Bailey. Bailey was unable to properly supervise Falbo. The trial court stated, "Falbo, who was acting on Ms. Bailey's behalf under a power of attorney, just wasn't appropriate in those circumstances."

Bailey's counsel argued there was no showing of an actual conflict of interest. The trial court rejected this argument finding that it only had to be an appearance of a conflict of interest. Bailey's counsel also argued for the first time that under Insurance Code section 10233.2, the Board could not change or deny a long-term policy based on mental impairment. Further, the Board was aware of the mental impairment in 2002.

The trial court found that there was evidence of a conflict of interest. As such, the writ was denied. The judgment denying the writ was entered on September 12, 2012. Bailey filed a notice of appeal on November 5, 2012.

II

TERMINATION OF FALBO AS AN INDEPENDENT PROVIDER

The sole issue to be resolved on appeal is if the Decision was supported by substantial evidence as was found by the trial court in denying the writ.

21

A.      *Standard of Review*

Code of Civil Procedure section 1094.5 sets forth the procedure for judicial review of an order or a decision by an administrative agency.  (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137.)  "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (Code Civ. Proc., § 1094.5, subd. (b).)

As noted *ante*, the trial court reviewed the decision using independent judgment.  On appeal, the parties agree that the correct standard of review is whether there was substantial evidence to support the Decision.[5]  In *Bixby*, the court addressed the standard of review as follows:  "The trial court must exercise its independent judgment upon the weight of the evidence produced or which could not, in the exercise of reasonable diligence, have been produced before the administrative agency and any evidence which might have been improperly excluded by the administrative agency.  [Citations.]  After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence.  [Citations.]"  (*Bixby*, at p. 143, fn. 10.)

---

[5]      The Board argues on appeal that we can consider the substantial evidence claims raised by Bailey as waived as she presented only evidence favorable to her position in her opening brief.  We disagree and find no waiver.

22

"'Substantial evidence has been defined as relevant evidence that a reasonable mind might accept as adequate support for a conclusion. [Citation.] A presumption exists that an administrative action was supported by substantial evidence. [Citation.] The burden is on the appellant to show there is no substantial evidence whatsoever to support the findings of the [agency.]' [Citation.]" (*Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 928.)

B.     *Analysis*

In 1995, the Public Employees' Long-Term Care Act was adopted by the Legislature. (Govt. Code, § 21660.) It provided that the Board would contract with carriers offering long-term care insurance plans and enter into health care service plan contracts covering long-term care. (Govt. Code, § 21661, subd. (a).) Retired and active employees were eligible to sign up for the long-term care. (Govt. Code, § 21661, subd. (d), et. seq.)

Subdivision (h) of section 21661 of the Government Code provides, "The board shall establish eligibility criteria for enrollment, establish appropriate underwriting criteria for potential enrollees, define the scope of covered benefits, define the criteria to receive benefits, and set any other standards as needed." Further, a fund was created to administer any long-term care plan and it was "held for the exclusive benefit of enrollees in the long-term care plans." (§ 21664, subd. (e).)

Under Civil Code section 1643 "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." As a basic goal of

23

contract interpretation, the courts seek "to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

The ALJ made the factual findings in the Decision that the contract between the parties was the EOC and ACPP. The ALJ cited to the language in the EOC that benefits would be provided if the "care is approved and received," and the service is covered by the EOC. Under the EOC, home health care was covered but only if care was provided by a home health care services agency or a licensed and certified individual. It also noted the language of the ACPP that allowed for benefits for "providers, treatments, or services not otherwise specified in the [EOC]." The ALJ also noted the language, "We also reserve the right to decline to authorize alternative benefits and services." The ALJ concluded that Falbo only qualified under the ACPP.

The ALJ also referred to the IP release of liability form, which Bailey signed, that provided that the employer/employee relationship was between her and the IP. Further, it referred to language that, "CALPERS reserves the right to terminate approval of a Plan of Care at any time if the Care Manager determines that use of any Independent Provider is no longer appropriate." The POC that Bailey received included language that "this Plan of Care is not a guarantee of benefits and will be amended as your care needs change."

Moreover, the language in the ACPP stated that benefits would continue under its provisions if they were (1) cost effective; (2) appropriate to the person's needs; (3)

24

consistent with general standards of care; and (4) provided the person with equal or greater quality of care.

Here, Falbo was approved in 2002 as the IP based on the request of Bailey. The ALJ determined that at the time Bailey was not cognitively impaired. Cognitive impairment was important since Bailey was placed in an employee/employer relationship with Falbo. The ALJ specifically determined that prior to 2008, there was no record of Bailey's cognitive impairment. This was supported by the evidence at the hearing from Blevins who testified she had become unable to manage her own affairs in the prior two years and from the diagnosis by her primary care physician who stated she became impaired in 2008.

Based on Bailey's cognitive impairment, it was reasonable for the Board to be concerned that a conflict of interest was apparent if Falbo continued as the IP with no oversight. It was undisputed that Falbo wrote checks to herself to reimburse herself for the care of Bailey. Falbo was the only person who filled out the timesheets. The validity of the timesheets was questionable due to numerous misrepresentations by Falbo.

Based on the foregoing language, the Board could properly determine, under the language of the EOC and ACPP, which Bailey originally agreed to when signing up for long-term care insurance, that use of Falbo as an IP was no longer acceptable. The Board could determine that the use of Falbo as the IP no longer was appropriate for Bailey's needs once she became cognitively impaired. The ALJ decision finding that Falbo had a conflict of interest, and the denial of the writ, are supported by substantial evidence.

Bailey claims that the evidence presented showed that Bailey was aware that Falbo was writing checks to herself and approved of such practice. Bailey also relies on the fact that there was not a joint account from which Falbo was withdrawing money. Further, there was no testimony from the evaluator that determined Bailey was unable to approve of Falbo and was confused. The decision was clear: when Bailey was not cognitively impaired, she could authorize such practice. However, once she became impaired, it raised a potential for abuse by Falbo. As noted, *ante*, there was evidence that supported that Bailey was no longer capable of taking care of her own affairs. Moreover, Dr. Rouzier stated that Bailey could perform almost no functions. She could merely sit and open and close her eyes.

Bailey also claims that there was no credible evidence of sporadic timesheets submitted to support a conflict of interest. She argued the only evidence was Forsell's testimony that the timesheets were sporadic. Further, the timesheets were submitted in accordance with directions by CalPERS' care manager, Peterson. Bailey has provided no argument that all of the reasons stated for terminating care must be supported by the evidence. Moreover, there certainly was concern that the timesheets submitted were incorrect. It is especially concerning that Falbo submitted timesheets for care while on vacation. Moreover, Bailey was responsible, according to the release of liability, to submit the timesheets. It was clear that Falbo had taken over this task.

Bailey also claims that, when she was mentally competent, she entrusted Falbo to have power of attorney and be an IP. Essentially, she claims that Bailey would approve of Falbo taking care of her finances. This may be true but the Board did not have an

26

obligation to keep Falbo under the language of the EOC and ACPP if it was concerned for Bailey. Falbo showed some questionable decisions in that she admittedly provided false timesheets and billed Bailey for time that she was on vacation.

Bailey also relies on Insurance Code section 10233.2 for the argument that long-term care insurance cannot be "canceled, nonrenewed, or otherwise terminated" on the grounds of mental disability. Insurance Code section 10233.2 provides as follows: "Long-term care insurance may not: [¶] (a) Be cancelled, nonrenewed, or otherwise terminated on the grounds of the age or the deterioration of the mental or physical health of the insured individual or certificate holder." Here, the Board did not seek to terminate Bailey's benefits. The Board agreed to continue benefits but was concerned about Falbo being the IP. No violation of the Insurance Code was proven.

Bailey also refers to Insurance Code section 10110.6 which she claims "outlaws discretionary clauses" in long-term care insurance policies. Insurance Code section 10110.6, subdivision (a) provides as follows: "If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void or unenforceable." Bailey does not provide any further argument as to how the language of the EOC and ACPP violated this provision. Moreover, the ACPP provided

27

specific language that the authorization for an IP could be terminated based only on four determining factors.

Based on the foregoing, the Decision was supported by substantial evidence and the trial court properly denied the writ. Bailey has failed to meet her burden of showing that there was "no substantial evidence whatsoever to support the findings . . ." (*Bhatt v. State Dept. of Health Services, supra,* 133 Cal.App.4th at p. 928.)

III

DISPOSITION

We affirm the denial of the petition for writ of administrative mandamus. The Board will recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
J.

We concur:

McKINSTER _____
Acting P. J.

CODRINGTON _____
J.

28