Filed 3/6/15  Redlich v. Heilbrunn CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JEANETTE REDLICH,<br><br>Appellant,<br><br>v.<br><br>EVA HEILBRUNN,<br><br>Respondent. | D064642<br><br>(Super. Ct. No. 37-2012-00151256-PR-TR-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Jeanette Redlich, in pro. per., for Appellant.

Alspaugh & Alspaugh and George A. Alspaugh, Jr., for Respondent.


Stella Redlich (Mother) died in April 2010, leaving three adult daughters.  Her estate documents consisted of a pour over will and a trust (Trust) leaving all of her property to her daughters.  Two of the daughters, Eva Heilbrunn (Eva) and Jeanette Redlich (Jeanette) disputed various aspects of estate and trust matters and some of these proceedings are ongoing.

This appeal concerns Jeanette's challenge to a July 11, 2013 order determining: (1) Mother's Trust assets may be used to satisfy probate administration expenses and creditor claims; (2) a parcel of real property in Humboldt County (Humboldt property) is a Trust asset and this property shall be sold to satisfy the outstanding probate expenses and creditor claims; and (3) the trustee may proceed with an unlawful detainer action to evict Jeanette from the Humboldt property.

In challenging this order, Jeanette contends: (1) the court erred in ruling the Trust is responsible for estate debts and expenses under Probate Code section 19001, subdivision (a)[1]; (2) the Humboldt property is not a Trust asset and therefore the court erred in ordering it sold to satisfy the estate's unsatisfied creditor claims and expenses; (3) the court erred in permitting the trustee to proceed with the unlawful detainer action; and (4) her due process rights were violated by the court's order granting Eva a continuance to file an opposition to Jeanette's trust petition. We reject these contentions and affirm the order.

FACTUAL AND PROCEDURAL SUMMARY

*Background*

For many years, Mother owned and lived in a home in San Diego. In 1997, Mother purchased another small parcel of property in Northern California (the Humboldt property). The property was (and still is) largely undeveloped with a mobile home on it.

---

1    All further statutory references are to the Probate Code unless otherwise specified. For ease of reference, we omit the word "subdivision" when referring to section 19001, subdivision (a).

2

The next year, in October 1998, Mother created a revocable trust, naming herself as the sole trustee and her daughter Eva as the successor trustee. The Trust expressly states that it is revocable by the trustor. The Trust additionally stated that upon Mother's death, the trustee "shall divide the trust estate into [three] equal shares" with one share going to each daughter.

Shortly after, Mother executed a deed transferring title to the Humboldt property into the Trust. Thereafter, Mother paid all the taxes, insurance, and other expenses for the Humboldt property, and Jeanette lived at the property (for at least a portion of each year).

About 12 years later, on January 19, 2010, while Mother was in the hospital, Jeanette prepared (with Mother's assistance) a typewritten amendment to the Trust (Trust Amendment), stating:

> "I am going to add this item to my Last Trust & Will concerning the house I own at [the Humboldt house address] in which my daughter Jeanette Redlich is living.
>
> "It is my intention that this home always be used by Jeanette Redlich as she sees fit. This home is not to be sold without Jeanette's express consent in writing. Also this home is not to be sold unless my [San Diego] home is sold first.
>
> "I am signing this note because I have left Eva as the Executor of the Trust and I do not want any misunderstanding about the decision for Jeanette to retain this [Humboldt] property . . . ."

Mother signed this document, as did witness David Thornton.

About three months later, in April 2010, Mother died. Her will named Eva as executor.

3

*Accounting Petition*

Two years after Mother's death, in April 2012, Jeanette filed a petition in probate court to compel an accounting for the Trust, remove Eva as trustee, and appoint herself as trustee (Accounting petition). Jeanette asserted numerous grounds for Eva's removal as trustee including that Eva had not filed any accountings, improperly delayed in selling Mother's San Diego home, and had not paid the property taxes or insurance for the Humboldt property since Mother's death. The third sister (Shirley) supported Eva's removal and Jeanette's appointment as trustee.

Shortly before trial was scheduled to begin on this petition, Eva resigned as trustee. About 10 days later, in October and November 2012, the court conducted a two-day trial on Jeanette's Accounting petition. A primary focus of the trial was the appropriate disposition of Mother's personal property and Eva's liability for her alleged negligence handling trust property, including delaying the sale of the San Diego home (which was encumbered by a reverse mortgage).

At the conclusion of the trial, the court tentatively found Eva had breached certain of her duties, but that these breaches were not intentional or in bad faith. The court indicated it may surcharge Eva for this conduct (by striking her executor fee request) and acknowledged the Trust property (including the Humboldt property) likely needed to be sold to satisfy estate debts, but concluded it would postpone making a final determination on the issues pending the filing of a new amended accounting. The court also appointed an independent professional trustee as successor trustee, and denied Jeanette's request that she be appointed trustee. The court's written minute order indicates that no final

4

decision was made on the estate accounting or distribution issues, that Eva's attorney would file an amended accounting, and Jeanette's petition challenging the trust accounting was moot. No party filed an appeal from these orders.[2]

*Eva's Petition To Sell Trust Property*

Eva, as executor, thereafter petitioned for final distribution of Mother's estate. In the petition, Eva alleged that Mother's estate is insolvent and unable to pay the expenses of administration, and she sought an order that the Trust is liable for the estate debts and for the sale of the Humboldt property, as the only remaining Trust asset. A case management conference on this petition was scheduled for May 13, 2013.

*Jeanette's Responses to Eva's Request To Sell the Humboldt Property*

In response to Eva's claims (as executor) that the Humboldt property would need to be sold, Jeanette filed three separate petitions for instructions in the Trust matter. (§ 17200.) The court's rulings on the latter two petitions are the subject of this appeal.

First, Jeanette filed a petition requesting the court to confirm the validity of Mother's January 2010 Trust Amendment. Eva did not oppose this petition, and in December 2012, the court entered an order upholding the validity of the Trust Amendment.

_____

[2] The appellate record contains the reporter's transcript of the second day of the hearing on Jeanette's Accounting petition. Contrary to Eva's claim, this court never issued an order "disallow[ing]" this transcript. Eva refers to an appellate court clerk's letter about a clerical matter, which does not constitute a court ruling on the propriety of including the transcript (identified with the superior court number of the trust matter) as part of the appellate record. We consider the information in this transcript for background information regarding the appellate issues before us.

Second, in February 2013, Jeanette filed a petition seeking an order "determining that [the] Trust is not liable for costs of administration and creditor claims arising in [the] probate proceeding, and for [an] order interpreting the [Trust Amendment]" (February 2013 petition). She raised two arguments in this petition.

Jeanette argued that trust assets are available to estate creditors only if the trust was revocable "*at the time of the settlor's death*," (§ 19001(a), italics added), and Mother's Trust does not satisfy this statutory requirement because she had been incompetent and in a coma for three days before her death.

Jeanette additionally argued that in executing the Trust Amendment, Mother intended that Jeanette "always be able to use [the Humboldt property] without any restrictions and to retain, i.e. own, [this property]." Jeanette thus requested the court to order that the Trust Amendment "provides for a specific gift of the [Humboldt] real property . . . outright and free of trust, in fee simple to Jeanette . . . ." Jeanette claimed this interpretation could be gleaned from the plain language of the Trust Amendment, but also argued that to the extent the language was ambiguous, her proposed interpretation was supported by extrinsic evidence of Mother's intent. In support, she submitted her own declaration and the declarations of her sister Shirley and witness David Thornton.

In her declaration, Jeanette described Mother's statements about the reason for the Trust Amendment:

> "In January 2010 my mother and I discussed putting something in writing which would show I was to receive the [Humboldt property] which was at that time in the [Trust] . . . . [Mother's] purpose in signing the January 19, 2010 amendment which she expressed to me verbally was to insure that I would receive the [Humboldt property]

6

and to prevent my sister, Eva . . . , who was the trustee of the trust, from selling it and using the money to pay off the loan owed on my mother's [San Diego] residence . . . . My mother wanted me to have the [Humboldt property] without any restrictions. She never discussed, or otherwise indicated, that she only wanted me to have the [property] for my life. Before January 19, 2010 [Mother] said on several occasions in front of me and my two sisters, [Eva and Shirley], that [she] wanted me to have the [Humboldt property]."

Jeanette also stated: "My mother never required me to pay for any property taxes or property insurance on the [Humboldt property] and I never paid those items. My mother knew I had limited income and she paid those items while she was alive."

Thornton, who said he is a family friend, stated in his declaration that when Mother bought the Humboldt property, she told him "she bought the property for Jeanette because she wanted Jeanette to have a place of her own. . . . Jeanette was not married and [Mother] wanted Jeanette to have a place free and clear." He also said that when Mother's "health started to fail," she said "she was happy that she bought the [Humboldt] property. It gave her peace of mind that Jeanette was going to have her own place . . . [and] that she felt there was enough value in her [San Diego] home . . . that all three of her daughters would have something to split between themselves."

In her declaration, Shirley said that Mother told her "on several occasions that she bought the [Humboldt] property . . . for my sister Jeanette." She said: "My mother explained to me that she had paid for both my and my sister Eva's weddings and that she had never paid for any wedding for Jeanette and was giving her the [Humboldt property] because of that. . . ." She also said: "My mother never said she was placing any restrictions on [Jeanette's] receipt of that property" and that Eva was "always aware my

7

mother's intent was that [Jeanette] receive the [Humboldt property] when my mother died."

As explained in more detail below, although Eva did not initially file an opposition to this motion, the court granted Eva's attorney a continuance and ordered that Eva file the opposition by May 8. The court scheduled the matter for a hearing on May 13, to be consolidated with a case management conference on Mother's estate matters.

About one week after the court granted the continuance, Jeanette filed an additional trust petition (the third trust petition) seeking an order instructing the trustee to refrain from taking any action to remove her from the Humboldt property or to sell the Humboldt property. The court granted the motion in part, ordering that the trustee not take any action to remove Jeanette from the Humboldt property pending further court order.

In her written opposition to Jeanette's February 2013 petition, Eva argued Jeanette's proposed interpretation of section 19001(a) is unsupported. Eva also disagreed with Jeanette's proposed interpretation of the Trust Amendment, arguing that this amendment reflected Mother's intent that Jeanette receive the Humboldt property only if there were sufficient assets to give the other daughters equivalent assets and/or that the amendment was intended to provide Jeanette with only a life estate in the property upon Mother's death. Eva argued that under either interpretation, "the Humboldt . . . property [remains] the sole asset of the Trust, and must be sold to satisfy the expenses of probate administration, creditor claims, attorney fees, trustee fees and trust administration costs of the settlor." Eva did not submit additional extrinsic evidence in support of her position.

8

*May 13 Hearing*

At the May 13 hearing, the court stated it had not yet had the opportunity to "go through" all the papers on Jeanette's February 2013 petition, but wanted to discuss the issue whether an evidentiary hearing was required. After discussion between court and counsel, the court concluded that extrinsic evidence was unnecessary on the section 19001(a) issue because it appeared undisputed that Mother was not capable of making a change to her Trust several days before her death, and therefore the sole issue for the court's consideration was the legal effect of this incapacity on the Trust's liability for the estate debts.

Regarding the Trust Amendment issue, the court proposed it would review the Trust Amendment and if it found it was not ambiguous, it would decide the issue without reviewing the declarations, but if it found the Trust Amendment ambiguous, it would review the declarations. Both counsel agreed with this approach, but Jeanette's counsel stated he wanted the opportunity to orally present argument on this issue. The court agreed, and continued the hearing for three days to May 16. The court stated "That will give me the advantage of having read the papers and then I'll have my questions ready and can hear argument at that time."

*May 16 Hearing*

On May 16, the court held a combined hearing on three separate (but overlapping) matters: (1) Jeanette's February 2013 petition; (2) Jeanette's petition seeking to preclude the trustee from evicting her from, or selling, the Humboldt property; and (3) a case management conference on the continuing estate accounting matters.

On the February 2013 petition, the court addressed two issues: (1) the applicability of section 19001(a); and (2) the proper interpretation of the Trust Amendment. On the first issue, Jeanette's counsel argued at length that section 19001(a) did not apply because Mother's trust was irrevocable based on her mental incompetency within days of her death. The court was unpersuaded by this argument, noting that section "19001(a) does not turn on whether in the instant of death the person was completely capable and able to revoke or whether there was a loss of capacity that extended days or hours or minutes to the moment of death. [¶] . . . [I]t would be a pretty strange public policy to have it turn on such [a] capricious matter."

On the second issue, Jeanette's counsel argued the language of the Trust Amendment and the surrounding circumstances show Mother intended "to give Jeanette . . . the beneficial ownership" of the "entire [Humboldt] property," and not merely a life estate or limited use of the property. In response, Eva's counsel acknowledged that the Trust Amendment reflected Mother's intent that Jeanette would be given the property within the Trust, but argued this intent cannot trump California law that assets of a revocable trust are subject to creditor claims. Eva's counsel also argued the Trust Amendment did not contain any provisions showing Mother wanted to alter the Trust language that the three daughters would obtain an equal share of the trust estate.

After considering counsel's arguments, the court found the Trust Amendment did not preclude the court from ordering the property sold to satisfy the estate debts. The court first discussed that it was "clear" that Mother had not transferred the Humboldt property as "an inter vivos gift during [her] life," noting that Mother had paid the taxes

10

and insurance on the property, was aware that "Jeanette had no way to pay [for] those things"; and it "would have been an easy matter to transfer [the property] by deed . . . but that didn't happen." The court additionally found the Trust Amendment could not be reasonably read to reflect Mother's intent that Jeanette be given the Humboldt property outside the Trust because Mother "knew that Jeanette [c]ouldn't pay the taxes and insurance and then it would be lost. So the only way to make sure that Jeanette could actually use it, was to keep it in trust to make sure that it could continue to be available for Jeanette." The court then stated:

> "I think . . . what [Mother] was really thinking in 1998 was her estate was going to be big enough to have a house and property and some other things to pass to her kids. I don't think she ever contemplated that at the time of her death the house she lived in would be completely under water and the other assets really had been dissipated. . . .

> "So although I had been leaning toward the idea that this was a specific gift, . . . [I no longer think so] because [the Trust Amendment] said the home is not to be sold without Jeanette's expressed consent. And if it were a specific devise to Jeanette, that wouldn't be required. Jeanette would own it. She herself would decide whether to sell it or not. . . .

> "And so at the end of the day, I conclude that the intent of the trustor was for the property to remain in trust during Jeanette's lifetime, for her life time use."

In response to counsel's question whether it found "enough of an ambiguity to consider extrinsic evidence," the court responded: "No. I did not consider any extrinsic evidence, because I don't find the document to be ambiguous. I think it reflected what the settlor had in mind at the time. And unfortunately circumstances have moved on such that that's not going to be possible."

11

The court then confirmed its earlier determination that the Humboldt property would need to be sold because it was the only remaining Trust (or estate) asset, and there remained unsatisfied creditor claims and/or estate administration costs. The court also raised the issue of the proper distribution of the balance of the funds after the property was sold and the creditor and estate claims were satisfied. But the court concluded it would reserve the issue "for another day" and would allow both parties at that time to present argument on the issue.

*Final Order*

Several months later, on July 11, 2013, the court issued a written order reflecting its final rulings on Jeanette's Trust petitions. The order stated: (1) Jeanette's February 2013 petition "is denied"; (2) the Trust is responsible for paying "unsatisfied costs and expenses of the probate administration . . . , including, but not limited to costs of administration, creditor's claims and statutory and extraordinary attorneys fees ordered by this Court"; (3) the Humboldt property shall be sold to pay the estate's unsatisfied costs and expenses; (4) the trustee shall proceed with an unlawful detainer action to evict Jeanette from the Humboldt property; and (5) all expenses of the unlawful detainer action shall be paid by and deducted from the share of the Trust distributable to Jeanette.

Jeanette appeals from this order.

DISCUSSION

I. *Scope of Appeal*

"[T]he notice of appeal . . . defines the scope of the appeal by identifying the particular judgment or order being appealed." (*Morton v. Wagner* (2007) 156 Cal.App.4th 963, 967.) Jeanette's notice of appeal identifies only the July 11, 2013 order as the order from which she is appealing. This order—which denied Jeanette's section 17200 petitions for instructions seeking to preclude the sale of the Humboldt property and prevent the unlawful detainer action—is appealable under applicable statutes. (§ 1304, subd. (a); Code Civ. Proc., § 904.1, subd. (a)(10).)

Before considering Jeanette's specific challenges to this order, we note that a significant portion of Jeanette's discussion in her appellate briefs concerns additional factual matters that were not before the court at the May 16 hearing and were not encompassed within, or resolved by, the challenged July 2013 order. For example, Jeanette discusses at length the claims raised in her earlier Accounting petition that Eva acted below the applicable standard in executing her trustee duties to promptly sell Mother's San Diego home and dispose of various personal property items. However, the court specifically declined to issue a final ruling on these issues until an amended accounting had been filed, and there is no indication the court has entered a final ruling on these claims and/or has determined the amount (if any) that Eva will be surcharged for alleged breaches of her trustee/executor duties.

13

Because the July 2013 order does not include any final rulings on these challenges, the claims are not properly before us. Under well-established appellate rules, we disregard those portions of the brief that do not pertain to the order from which Jeanette appealed. (See 2 Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 9.128, p. 9-39.)

## II. *Section 19001(a)*

Jeanette contends the court erred in concluding the Trust was revocable within the meaning of section 19001(a) and thus that the Trust assets were subject to unsatisfied creditor claims and estate expenses.

Section 18200 provides: "If the settlor retains *the power* to revoke the trust in whole or in part, the trust property *is* subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor." (Italics added.) Section 19001(a) provides: "Upon the death of a settlor, *the property of the deceased settlor that was subject to the power of revocation at the time of the settlor's death* is subject to the claims of creditors of the deceased settlor's estate and to the expenses of administration of the estate to the extent that the deceased settlor's estate is inadequate to satisfy those claims and expenses." (Italics added.)

Under these code sections, if estate assets are insufficient to satisfy the deceased's creditor claims or estate administration costs, the claims may be satisfied from assets the deceased settlor placed in a *revocable* inter vivos trust. (See *Laycock v. Hammer* (2006) 141 Cal.App.4th 25, 29-30; *Cobler v. Arluk Medical Center Industrial Group* (2001) 89

14

Cal.App.4th 530, 540.) By its terms, this statute applies only to revocable trusts, and not to irrevocable trusts. (*Laycock, supra*, 141 Cal.App.4th at p. 30.)

It is undisputed that Mother's trust was revocable during her lifetime. Under the Trust's express terms, Mother was the sole trustee and had the *power* to revoke the trust terms until her death. Thus section 19001(a) applies to provide that the trust assets were subject to the creditor claims and estate administration expenses upon Mother's death.

Relying on section 19001(a)'s reference to "property . . . that was subject to the power of revocation *at the time of* the settlor's death" (§ 19001(a), italics added), Jeanette argues this code section is inapplicable because Mother was physically and mentally incapacitated "*at the time* of her death," i.e., within hours or days of her death. (Italics added.) Jeanette argues that although Mother had the authority to revoke her trust at that time, she had no practical ability to do so, and therefore the trust became legally "irrevocable" when she became mentally incompetent several days before her death.

The statute cannot be reasonably read to support this novel argument. The Legislature expressly mandated that creditors may reach trust assets if the settlor "retains the power to revoke the trust in whole or in part" during the settlor's lifetime (§ 18200), and section 19001(a) permits estate creditors to benefit from this same rule after the trustor's death. Neither of these code sections condition the revocability status on the trustee's factual ability to exercise this power shortly before his or her death. Any such statutory construction would be contrary to the legislative intent that a revocable trust permits a trustor to avoid probate, but not creditors' claims. A "revocable inter vivos trust is a probate avoidance device, but does not prevent creditors of the settlor[ ] . . . from

15

reaching trust property."  (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1349.)  As the trial court noted, many individuals may be deemed "incompetent" in the hours or days before their death, but there is nothing in the statute logically suggesting that the Legislature intended to exempt these individuals from the general rule that a revocable trust does not protect assets from unsatisfied estate-expense and creditor claims.

"In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute.  [Citation.]  We begin with the language of the statute, giving the words their usual and ordinary meaning.  [Citation.]  The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." '  [Citation.]"  (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)

Under these well-settled principles, Jeanette's focus on the words "at the time of the settlor's death" is misplaced.  (§ 19001(a).)  Examining this phrase in the context of the statute as a whole and the overall statutory scheme, the Legislature did not intend to protect the assets of a revocable trust from a creditor's reach merely because the person was mentally incompetent for a few hours or a few days before his or her death.  The court properly construed section 19001(a) to provide that trust assets are subject to creditor claims and estate administration expenses if the trustor had the power to revoke the trust during his or her lifetime.

III.  *Interpretation of Trust Amendment*

Jeanette next contends the court erred in rejecting her claim that the Humboldt property was not part of the Trust because the Trust Amendment effectively removed the property from the Trust and was intended to convey the property to Jeanette without restriction.

A.  *Legal Principles*

In construing trust instruments, the court's duty is to ascertain and then, if possible, give effect to the trustor's intent.  (*In re Estate of Gump* (1940) 16 Cal.2d 535, 548; *Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.)  We consider the instrument's plain language, interpreting words in their ordinary and grammatical sense, unless a different interpretation can be clearly ascertained.  (*Huscher v. Wells Fargo Bank* (2004) 121 Cal.App.4th 956, 972.)  In so doing, we consider the entire trust instrument, not just separate parts of the document or documents.  (§ 21121.)

The paramount rule is to determine intent *from the instrument itself* in accordance with applicable law.  (*Brown v. Labow* (2007) 157 Cal.App.4th 795, 812.)  However, if the language is susceptible to two different reasonable interpretations, the court may consider extrinsic evidence.  (*Estate of Russell* (1968) 69 Cal.2d 200, 211.)  Extrinsic evidence may also be admitted to determine *whether* the agreement is susceptible to two different reasonable interpretations.  (*Ibid.*; *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73.)

" 'The interpretation of a written instrument, including a [trust document], presents a question of law unless interpretation turns on the competence or credibility of extrinsic

17

evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]' [Citations.]" (*Scharlin v. Superior Court, supra*, 9 Cal.App.4th at p. 168.) We also conduct a de novo review of the threshold issue whether to admit extrinsic evidence to prove a meaning to which the language of the instrument is reasonably susceptible. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).)

"When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the [instrument]. [Citations.] When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld if it is supported by substantial evidence." (*Founding Members, supra*, 109 Cal.App.4th at pp. 955-956.)

### B. *Analysis*

After considering the parties' submissions and arguments, the court found the Trust Amendment did not transfer the property outside the Trust, and instead was intended only to provide for a proper disposition of the property within the Trust. On our independent review of the record, we concur with the court's determination.

We repeat the words of the Trust Amendment here:

> "I am going to add this item to my Last Trust & Will concerning the house I own at [the Humboldt house address] in which my daughter Jeanette Redlich is living.

18

"It is my intention that this home always be used by Jeanette Redlich as she sees fit. This home is not to be sold without Jeanette's express consent in writing. Also this home is not to be sold unless my [San Diego] home is sold first.

"I am signing this note because I have left Eva as the Executor of the Trust and I do not want any misunderstanding about the decision for Jeanette to retain this [Humboldt] property . . . ."

This language does not suggest Mother was intending during her lifetime to convey fee simple ownership of this property to Jeanette outside the Trust. The first paragraph affirms Mother's (or her Trust's) ownership of the property. The second paragraph begins by stating that Mother intends the home "always be used by Jeanette . . . ." This statement about the "use[ ]" of the property cannot be reasonably interpreted as reflecting a present intent to *transfer ownership* of the property. The next two sentences reinforce this conclusion. These sentences provide that Jeanette must "consent" in writing to any sale of the Humboldt property and this property should not be sold until Mother's San Diego home is first sold. In imposing these conditions, Mother necessarily recognized that the Humboldt property might have to be sold and that *other* individuals (such as the successor trustee) would be making that decision. If Mother intended to give Jeanette an unfettered ownership right to the property before Mother's death, there would be no need to state or suggest that Jeanette would need to consent to a sale of the property or that certain other property should be sold first. A property owner has the unqualified right to buy or sell his or her own property, and does not need consent from a third party. Likewise, Mother's statement in the third paragraph that she was executing the Trust Amendment "because I have left Eva [as trustee] and I do not want

19

any misunderstanding about the decision for Jeanette to *retain* this property . . ." does not suggest a present intent to convey the property from the Trust. A retention of the property suggests a continuation of current circumstances, i.e., that Jeanette would be entitled to continue living at the property before and after Mother's death.

Based on the plain language of the Trust Amendment, the court correctly concluded extrinsic evidence was unnecessary to evaluate Jeanette's contention that Mother had conveyed the Humboldt property to her during Mother's lifetime. The only reasonable interpretation of the Amendment's language is that Mother intended the property to stay within the Trust during her lifetime, and to designate one daughter (Jeanette) to receive an interest in the property after Mother's death. Regardless whether Mother intended to convey a fee simple interest or a life estate upon her death, the property remained a Trust asset until Mother's death and thus was subject to unsatisfied creditor/estate claims under section 19001(a).

Moreover, even if there was an ambiguity, the undisputed extrinsic evidence confirms our conclusion. Each of the declarants (Jeanette, Thornton, and Shirley) stated that Mother wanted Jeanette to continue to live at, and/or own, the property, after Mother's death. However, there is nothing in these declarations suggesting Mother intended to transfer the property to Jeanette at the time she executed the Trust Amendment. Jeanette in fact acknowledged that she was not financially capable of owning the property: "My mother never required me to pay for any property taxes or property insurance on the [Humboldt property] and I never paid those items. My mother knew I had limited income *and she paid those items while she was alive.*" (Italics added.)

20

This understanding was also reflected in Jeanette's admissions in her earlier Accounting petition in which she alleged that Eva had breached her trust duties by failing to pay taxes and insurance on the Humboldt property after Mother's death. If Jeanette had believed or understood that Mother had transferred the property to her before her death, Jeanette obviously would have been responsible for insurance and taxes for the property.

Accordingly, the court properly rejected Jeanette's argument that the Trust Amendment removed the Humboldt property from its status as a Trust asset. Based on this conclusion, the court did not err in ordering the property sold to pay for unsatisfied creditor claims and estate administration costs. (§ 19001(a).) Although Mother clearly wanted Jeanette to own or live at the Humboldt property after Mother's death, this intent does not trump section 19001(a)'s rule that a decedent's assets are not protected from creditor or estate claims if the assets were in a revocable trust and are needed to pay for unsatisfied estate debts or estate administration costs.

The more difficult question is whether Mother's intent in executing the Trust Amendment was to direct (upon Mother's death) the successor trustee to give Jeanette a life estate in the property or to transfer to Jeanette a fee simple interest in the property. Although the answer to this question does not affect or preclude the sale of the property (because under either interpretation the property remains a Trust asset at Mother's death and thus subject to creditors), it can affect the disposition of sale proceeds to the extent there are any funds remaining after creditor and estate claims are paid. But we need not

21

reach this issue because the court made clear that it would allow further evidence and argument on the issue of the disposition of the sale proceeds.[3]

Finally, we reject Jeanette's argument that the court erred by failing to provide her with the opportunity to personally satisfy estate debts before the court ordered the property sold. The record before us does not show that Jeanette sought this relief, or that she had the financial ability to satisfy these debts. Although her counsel raised the issue of settlement discussions to avoid a sale, he did not affirmatively state that Jeanette was willing and able to satisfy the estate debts to avoid a sale of the property. We likewise find unavailing Jeanette's argument that the court erred in ordering the property sold before a final estate accounting was completed and approved. Although the precise amount of creditor claims and estate administration costs had not yet been determined at the time of the May 16 hearing, it was undisputed that Mother's estate/trust had no remaining assets except for the Humboldt property, and the court had previously concluded that Trust property would need to be sold because the estate had unsatisfied debts. The purpose of the May 16 hearing was to consider Jeanette's contentions that the Humboldt property was not Trust property subject to creditor/estate claims. Once the court found those contentions lacked merit, the court did not err in ordering the property sold.

---

[3]     We recognize that at the hearing the court suggested a conclusion that the Trust Amendment gave Jeanette a life estate in the property under the Trust provisions. However, because the court did not incorporate this finding into its final written ruling and expressly left the disposition issue for further argument, we do not construe the court's reference to a life estate as a final ruling that can be reviewed on this appeal.

IV. *Unlawful Detainer Action*

In its July 11, 2013 order, the court ordered that the trustee "shall proceed with an unlawful detainer action to evict Jeanette . . . from the Trust real property [(the Humboldt property)] . . . ." Jeanette challenges this ruling in her appellate brief. However, the thrust of her challenge is to repeat her arguments that she is entitled to continue living at this property because this was Mother's intent. As explained, these arguments are without merit. Because the court determined the Trust was responsible for the estate debts under applicable statutes (see § 19001(a)), and it was undisputed the Humboldt property was the only remaining Trust asset and was necessary to cover estate debts, Mother's intent that Jeanette receive this property was not legally sufficient to preclude the sale.

Jeanette's reliance on *Martin-Bragg v. Moore* (2013) 219 Cal.App.4th 367 is misplaced. In *Martin-Bragg,* the parties disputed the unlawful-detainer plaintiff's title to the property, and these disputes involved " 'complex and complicated property ownership issues.' " (*Id.* at p. 385.) The reviewing court held the court abused its discretion in considering these issues in the summary unlawful detainer proceeding, and in refusing to consolidate the matter with a pending quiet title action. (*Id.* at pp. 384-395.)

This case is distinguishable because the probate court here *did* determine (after full briefing and a hearing) that the Humboldt property was a Trust asset. Once the court determined this ownership issue, it did not err in permitting the trustee to sell the property to satisfy estate debts and estate administration costs under section 19001(a).

23

In her appellate briefs, Jeanette additionally makes various accusations of wrongful conduct against the trustee in the eviction process. However, she does not provide any supporting record citation, nor does she show these facts were presented to the court at the May 16 hearing. Under well-settled appellate principles, we disregard these claims. (See *McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 947; *Gotschall v. Daley* (2002) 96 Cal.App.4th 479, 481, fn. 1.)

## V. *Due Process Contentions*

Jeanette contends her due process rights were violated when the court granted Eva a continuance on April 2 to file a response to Jeanette's February 2013 trust petition. The contention lacks merit.

### A. *Background*

After Jeanette filed her February 2013 petition, Eva did not file any written opposition before the scheduled April 2 hearing date. However, at the outset of this April 2 hearing, Eva's attorney appeared and requested a continuance to file a written objection to the petition. Jeanette's counsel did not oppose the continuance, but requested the court to prohibit any further eviction actions until the merits hearing, explaining that the trustee had served Jeanette with an eviction notice at the Humboldt property.

The court granted Eva's requested continuance, ordered Eva to file her opposition by May 8, and rescheduled the hearing to May 13. The court stated that Jeanette would need to file a motion to preclude the trustee from continuing eviction proceedings.

24

About one week later, the court granted Jeanette's ex parte motion to preclude the trustee from seeking to remove Jeanette from the home or from selling the property until after the hearing on the merits.

On May 7, Eva filed her opposition to Jeanette's February 2013 petition.[4]  The proof of service confirms that Jeanette was served with a copy of this opposition on May 7, and two days later, Jeanette filed a reply to Eva's opposition.  At the May 16 hearing, the court initially indicated that Eva's opposition had not been in the computer system, but then confirmed it had received a physical copy of the opposition and that it had reviewed the opposition.

B. *Analysis*

Jeanette contends the court violated her due process rights by granting a continuance to Eva at the April 2 hearing.

This contention is unavailing.  A court has broad discretion in granting a continuance (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527), and Jeanette's counsel did not oppose the continuance at the April 2 hearing.  To the extent that the continuance was not fully consistent with local rules, there was no prejudice to Jeanette.  Within one week, the court ordered that the trustee defer any eviction proceedings until the court ruled on the merits.  The slight delay to allow Eva to file an opposition brief on the issues did not cause any undue harm to Jeanette's interests.

---

4    This court granted Eva's request that the appellate record be augmented with this document because it had been inadvertently omitted from the clerk's transcript.

Jeanette had notice and a full opportunity to be heard on her trust petitions. The record affirmatively shows that before the merits hearing on May 16, the court reviewed all of the filed papers, and Jeanette's counsel had the opportunity to argue at length on the issues. The court's questions and discussion at the May 16 hearing showed it had a full understanding of the issues, the law, and the parties' arguments. Additionally, contrary to Jeanette's assertions, there is no support in the record showing the court was biased or improperly prejudged the issues. The court's reference to the fair market value of the Humboldt property before it ruled on Jeanette's February 2013 petition does not show bias or impartiality.

Likewise, we reject Jeanette's suggestions that her due process rights were violated because the court considered a document that she did not have an opportunity to review. In asserting this argument, Jeanette refers to Eva's written opposition to her February 2013 petition. The record affirmatively shows Eva's counsel filed this written opposition on May 7, 2013 and that this opposition was served on Jeanette's counsel by mail on this same date. The record also affirmatively shows that Jeanette's counsel received a copy of this opposition by email on May 7, 2013.

Although this opposition was not contained in the Clerk's Transcript, we granted Eva's motion to augment the record with this document because it was considered by the probate court. At the May 16 hearing, the court initially said it did not have a copy of Eva's filed opposition in the computer system, but then clarified that it had received a physical copy of the filed opposition and it had reviewed the document. There was no violation of Jeanette's due process rights regarding this opposition brief.

26

DISPOSITION

Order affirmed.  The parties to bear their own costs on appeal.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

27